# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAREN LEVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RESOURCE CAPITAL CORP., JONATHAN Z. COHEN,  DAVID J. BRYANT, ELDRON C. BLACKWELL, and DAVID E. BLOOM,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Docket No.: 1:15-cv-07081-LLS

<u>CLASS ACTION</u>

AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Lead Plaintiff Douglas Drees ("Plaintiff"), by and through his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Resource Capital Corp. ("Resource Capital" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by Resource Capital, press releases and other public statements issued by Resource Capital, and media reports about Resource Capital. Plaintiff believes that additional evidentiary support, the majority of which is in the possession and control of the defendants, will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased Resource Capital common stock between October 31, 2012 and August 5, 2015, (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against Resource Capital and certain of Resource Capital's executive officers and directors for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

2.      Resource Capital is a diversified real estate finance company that focuses on commercial real estate, commercial real estate-related assets, and, to a lesser extent, commercial finance assets. The Company is organized as a real estate investment trust ("REIT"). Throughout the Class Period, Resource Capital and certain of its senior executives deceived public investors by failing to alert them of a particularly risky and dangerous loan within their portfolio.

3.      The loan in question was a mezzanine loan secured by a number of luxury hotels (the "Mezzanine Loan").  When initially acquired in 2007, the Mezzanine Loan was secured by 13 hotels owned by The Blackstone Group ("Blackstone").  Three of the hotels serving as

1

collateral were located in Puerto Rico and, as time progressed, these three hotels came to be the only three assets securing the Mezzanine Loan. Defendants never disclosed this to investors.

4. Since 2006, however, Puerto Rico's economy has been suffering from a crippling recession. Connected to the recession is a mammoth debt crisis. Despite Puerto Rico's small population, if it were a state, its $73 billion in debt would rank third, behind only California and New York. Puerto Rico's failing economy has led its debt to be downgraded to junk status and returns on such debt to plummet.

5. Indeed, the continuing degradation of Puerto Rico's economy and credit led the Secretary of the Commonwealth of Massachusetts, William Galvin, to investigate several mutual fund families with high levels of investment in Puerto Rican debt, including OppenheimerFunds. As reported by the Wall Street Journal, Mr. Galvin initiated the investigation because "he was concerned local investors may be unaware of all the risks they are taking on." In Galvin's words, "[E]veryone knows there is a problem with Puerto Rican bonds."

6. Without regard to the Puerto Rican economic crisis, and despite the Company's recognition that the value of real estate debt is sensitive to local economic trends, Resource Capital went years without warning investors of the imminent need to write-down the Mezzanine Loan. In point of fact, Resource Capital never even disclosed its exposure to the Puerto Rican economy until the end of the Class Period.

7. On August 4, 2015, after the stock market closed, Resource Capital announced its financial results for the quarter ended June 30, 2015. The Company disclosed GAAP net loss of $31.0 million during the quarter. Contributing to the net loss, indeed the cause thereof, was the Company's recording of an allowance for loan loss on a mezzanine loan position of $41.1 million in total. As disclosed in the August 4 press release, "[t]he last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic

and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved."

8. As a result of the news, the trading price of Resource Capital's common stock plunged from its closing price of $3.48 on August 4, 2015, to close at $3.05 on August 5, 2015, a single-day loss of more than 12%, on extremely heavy trading. Accordingly, the announcement wiped out approximately $54.6 million of Resource Capital's market capitalization.

9. Resource Capital's stock would drop further as the Company disclosed more information about the Puerto Rico mezzanine loan and the charges incurred as a result of the impairment of the debt. On August 5, 2015, the Company held a conference call with investment analysts to discuss Resource Capital's financial performance in the second quarter of 2015. During the call, Defendants disclosed more specific information about the Puerto Rico mezzanine loan and the Company's business practices relating to investment in mezzanine loans backed by commercial real estate. Following the earnings call, Resource Capital stock fell to close at $2.97 per share on August 6, 2015 from its closing price of $3.05 per share on August 5, 2015. In total, the trading price of the Company's stock had fallen $0.51 per share, or 15%, from its closing price of $3.48 on August 4, 2015, prior to the Company's disclosures regarding the Puerto Rico mezzanine loan position.

10. Plaintiff brings this action to recover damages against Defendants.

## JURISDICTION AND VENUE

11. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

13. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because Resource Capital resides in this District—Resource Capital's principal executive offices are located at 712 5th Avenue, 12th Floor, New York, New York 10019.

## PARTIES

15. Plaintiff purchased Resource Capital's stock during the class period as set forth herein and in his certification filed in support of his motion for appointment as Lead Plaintiff. Plaintiff incorporates by reference his certification.

16. Resource Capital is a corporation organized and existing under the laws of Maryland. The Company maintains its principal executive offices at 712 5th Avenue, 12th Floor, New York, New York 10019. Resource Capital's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RSO."

17. Defendant Jonathan Z. Cohen ("Cohen") has been President, Chief Executive Officer, and a director of Resource Capital since 2005.

18. Defendant David J. Bryant ("Bryant") has been Senior Vice President, Chief Financial Officer, and Treasurer of Resource Capital since 2006.

19. Defendant Eldron C. Blackwell ("Blackwell") has been Vice President and Chief Accounting Officer of Resource Capital since March 2014.

20. Defendant David E. Bloom ("Bloom") has been Resource Capital's Senior Vice President, Real Estate Investments, since 2005.

21.     Cohen, Bryant, Blackwell, and Bloom are collectively referred to herein as the "Individual Defendants."

22.     Resource Capital and the Individual Defendants are collectively referred to herein as "Defendants."

23.     By reason of the Individual Defendants' positions with the Company as executive officers (and in Cohen's case, as a director as well), they possessed the power and authority to control the contents of Resource Capital's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

24.     Resource Capital is liable for the Individual Defendants' actions and conduct and scienter is imputed to the Company. Resource Capital is liable for the Individual Defendants' actions and conduct on the bases of respondeat superior and common law agency.

## SUBSTANTIVE ALLEGATIONS

### A.     Resource Capital's Commercial Real Estate-Related Assets

25.     Resource Capital is a diversified real estate finance company that focuses on commercial real estate, commercial real estate-related assets, and, to a lesser extent, commercial finance assets. The Company is organized as a REIT.

26.     According to the Company's Annual Report for Fiscal Year 2014 on Form 10-K filed with the SEC on March 2, 2015 (the "2014 10-K"), the commercial real estate-related investments held by Resource Capital include mezzanine loans. Mezzanine loans constitute approximately 5% of the Company's loan portfolio. Mezzanine loans are "loans that are senior to the borrower's equity in, and subordinate to a first mortgage loan on, a property." The Company explains that "[m]ezzanine loans typically have maturities that match the maturity of the related mortgage loans but may have shorter or longer terms [and the Company] expect[s] to hold these investments to maturity." (2014 10-K at 27.)

27.     As Resource Capital acknowledges, investing in commercial real estate mezzanine loans is "subject to the risks inherent in the real estate securing or underlying those investments[.]" Specifically, "[t]he ability of a borrower to repay a loan secured by or dependent upon an income-producing property typically depends primarily upon the successful operation of the property . . . . If the net operating income of the property is reduced, the borrower's ability to repay the loan may be impaired." In turn, the Company was warned that the "property location and condition; . . . changes in national, regional or local economic conditions and/or the conditions of specific industry segments in which [the Company's] lessees may operate; declines in regional or local real estate values; . . . [and] the availability of debt or equity financing" can affect the net operating income of the underlying properties and hence the performance of Resource Capital's mezzanine loan portfolio. (2014 10-K at 27.)

28.     Accordingly, with respect to Resource Capital's investments secured by properties within Puerto Rico (*i.e.*, the Mezzanine Loan), Puerto Rico's economy was of material relevance.

**B.    Puerto Rico's Economy**

29.    The Puerto Rican economy has been mired in a recession since 2006. According to an analysis of the Puerto Rican economy by former World Bank Chief Economist Anne Krueger, Ranjit Teja, and Andrew Wolfe (the "Krueger Report"), from 2004 through 2014, investment in the Puerto Rican economy as a portion of gross national product fell by more than ten percentage points. The following chart illustrates the declining investment in the Puerto Rican economy overall, and specifically in construction:



30.    The Krueger Report further explains that the Puerto Rican economy historically has tracked the economy of the United States mainland. Accordingly, Puerto Rico was significantly harmed during the downturn in the United States economy between 2007 and 2009. As the following chart illustrates, however, while the United States mainland's economy began to recover following fiscal year 2011, Puerto Rico's economy resumed its descent:



31.    The residential real estate market in Puerto Rico has also been seriously damaged. As detailed in the Krueger Report, house prices have fallen sharply, with the downturn preceding the similar phenomenon on the United States mainland. Indeed, the median sale price for existing homes fell 38% between fiscal year 2004 and 2014.

32.    In conjunction with Puerto Rico's economic decline and failing residential real estate market, Puerto Rico's banking sector has come under serious stress. According to the Krueger Report, between 2005 and 2015, commercial bank assets fell by 30% "as banks reduced their balance sheets in response to the hit to their capital from lower asset prices. The distress in the banking sector would have been worse were it not for the backstop provided by [the Federal Deposit Insurance Corporation], which had to intervene [in] several banks, and for initiatives such as [the Troubled Asset Relief Program]."

8

33.     Puerto Rico's economic woes are further illustrated by the extreme levels of public debt. The Krueger Report points to the crisis-level debt incurred by Puerto Rico, observing that "[p]ublic sector debt has risen every year since 2000, through good years and bad ones, reaching 100 percent of [gross national product] by end-[fiscal year] 2014. . . . The fact that debt was rising even in years before the economy started to contract says something about the weakness in public finances." Indeed, the Krueger Report highlighted the failure of the Puerto Rican government to stabilize the Commonwealth's balance sheet when asking rhetorically, "[H]ow could debt continue climbing in the face of one emergency measure after another to 'balance the budget' – from the sales tax in FY2006 to staff cuts in FY2009 to pension reform in FY2013?" Further evidence of the continual decline of Puerto Rico's fiscal health is the decline in tax revenues, which "slid markedly relative to nominal GNP, from over 15% of GNP prior to 2006 to around 12% despite new measures implemented in the intervening period."

34.     In April 2013, the president of the Government Development Bank for Puerto Rico, which is tasked with "safeguard[ing] the fiscal stability of Puerto Rico and promot[ing] its competitiveness to transform [the Commonwealth's] economy into one of the most developed economies in the world," described the bank's position as "fragile" before resigning three months later.

35.     In the Krueger Report's analysis, piecemeal fiscal reforms in Puerto Rico have left "a decade of stagnation and the cutoff of market access, which experience tells us has severe negative effects on credit, investment, and consumption."

36.     By the spring of 2013, Puerto Rico's fiscal crisis was well-known and obvious, eliciting reactions from the investing community. On August 26, 2013, the investing periodical Barron's ran a cover story titled *Troubling Winds* that discussed Puerto Rico's failing economy and crisis-level debt. The article noted that at the time of publication, Puerto Rico carried "$53

billion of tax-supported debt outstanding from more than a dozen issuers, according to Moody's Investors Service, and nearly $70 billion of total debt, according to the Commonwealth." The article went on to note that "[e]ven using the lower figure, Puerto Rico's debt load would rank third among the states, behind only California and New York." Puerto Rico's debt burden, however, was severely disproportionate to normative measures of the Commonwealth's financial health such as gross domestic product, personal income, and population. Indeed, Puerto Rico carried a debt burden of $14,324 per capita, 10 times the average of the 50 states and more than five times that of California, the state with the highest debt burden. Accordingly, as of August 2013, Puerto Rico's general-obligation bonds received the lowest investment grade ratings available from both Moody's and Standard & Poor's, and both maintained "negative outlooks on Puerto Rico's credit rating, meaning there is a possibility that its debt could get downgraded to junk in the coming year."

37.     The Barron's article also noted that "[a] closely watched index of economic activity compiled by the Government Development Bank for Puerto Rico[] shows a year-over-year decline of 4.5% in June [2013]. This indicator, which reflects gasoline consumption, payroll employment, electricity generation, and cement sales, has a high correlation with GDP."

38.     An article published by Kiplinger on September 17, 2013 titled *Beware Puerto Rican Bonds Hiding in Your Portfolio* also noted that Puerto Rico's gross domestic product declined by 5% in July 2013 compared to July 2012. This was the fastest rate of decline for the Puerto Rican economy in 41 months according to the Government Development Bank for Puerto Rico.

39.     Further, according to the Kiplinger article, between May 1, 2013 and September 17, 2013, the "Standard & Poor's Puerto Rico Municipal Bond index . . . plunged 19%[.]" Indeed, given the overwhelming debt owed by Puerto Rico, the article's author opined that

10

"[m]anagers who loaded up on these bonds should be fired—as should their supervisors." Goldberg noted that nine of the ten funds most heavily laden with Puerto Rican bonds were managed by Oppenheimer and that eight of the nine Oppenheimer funds lost between 11% and 15% over the three months leading up to the article's publication, which was "almost enough to wipe out the previous three years of positive returns."

40.     Investors in Puerto Rico's bonds noticed the Commonwealth's financial crisis, which was reflected in the performance of Puerto Rican municipal bonds. A Bloomberg article published on September 13, 2013, titled *OppenheimerFunds Loses Most as Puerto Rico Tumbles: Muni Credi*, highlighted the losses incurred by mutual funds with significant investments in Puerto Rican bonds. The Bloomberg article noted that "OppenheimerFunds Inc. is the biggest loser as mutual funds investing in municipal debt get pummeled by the worst year for Puerto Rican bonds since at least 2000." Specifically, an Oppenheimer municipal debt unit with 26% of its $6.5 billion in assets invested in Puerto Rican debt lost almost 12% from January 2013 through September 2013.

41.     The decline in Puerto Rico's economy and the resulting fallout for United States investors prompted the Secretary of the Commonwealth of Massachusetts, William Galvin, to investigate several mutual fund families with high levels of investment in Puerto Rican debt, including OppenheimerFunds. As reported by the Wall Street Journal on October 9, 2013 in an article titled *Massachusetts Probes Sales of Puerto Rico Bonds*, Mr. Galvin initiated the investigation because "he was concerned local investors may be unaware of all the risks they are taking on." In Galvin's words, "[E]veryone knows there is a problem with Puerto Rican bonds."

42.     Puerto Rico's economic decline and its concomitant debt crisis ultimately resulted in all three major credit rating agencies downgrading the Commonwealth's debt to junk status in the first two weeks of February 2014. As noted in a MarketWatch report dated February 12, 2014

11

titled *Puerto Rico bond turmoil sparks warning from muni fund*, from February 2013 to February 2014, the "Standard & Poor's Puerto Rico muni index dropped 21.3%, rare losses for the municipal bond market, which is often sought for its perceived safety." As a result of the downgrades, the OppenheimerFunds unit with heavy investment in Puerto Rican bonds referred to above amended its disclosures. One such disclosure was amended to state: "If the economic situation in Puerto Rico persists or worsens, the volatility, liquidity, credit quality, and performance of the Fund could be adversely affected[.]"

43.    The Standard & Poor's Municipal Bond Puerto Rico Index failed to recover fully following the downgrades. As of June 30, 2014, the index closed at 163.61, up from 157.55 on February 7, 2014, but still down 17.8% from February 4, 2013. Similarly, as of September 30, 2014, the index closed at 171.52, slightly higher than June, but still down 13.8% from February 4, 2013. By December 30, 2014, the index would drop to 170.44, down 14.3% compared to February 4, 2013. By March 31, 2015, the index dropped further to 168.25, down 15.4% compared to February 4, 2013.

44.    Puerto Rico's credit decline has continued to this date. On January 4, 2016, Puerto Rico defaulted on $174 million of debt payments. According to an article posted on The New York Times business blog DealBook on January 4, 2016 titled *Puerto Rico Defaults on Debt Payments*, Puerto Rico defaulted on the payment in order to pay the Commonwealth's "general obligation bondholders, who are entitled to be paid first, according to the Puerto Rican constitution." While using the cash to pay the general obligation bonds, the Puerto Rican government put its other bonds into default. Although the other bonds could be paid out of reserves, "drawing on a reserve without replenishing it is also considered a form of default." Furthermore, bonds issued by the Puerto Rico Infrastructure Financing Authority and the Public Finance Corporation do not have reserves. As a result, Standard & Poor's downgraded "the

infrastructure authority's rating from CC to D." According to Standard & Poor's, "[a]n obligation rated 'D' is in default or in breach of an imputed promise. . . . The 'D' rating also will be used upon the filing of a bankruptcy petition or the taking of similar action and where default on an obligation is a virtual certainty, for example due to automatic stay provisions."

45.     As detailed in a Reuters article dated January 8, 2016 titled *Bond insurers sue Puerto Rico over debt default, clawbacks*, insurers of the Puerto Rico's bonds sued the Commonwealth following the default, alleging that the Puerto Rican government's decision to divert payment to the general obligation bondholders was unconstitutional.

**C.     Resource Capital's Investment in the Mezzanine Loan**

46.     In 2007, Resource Capital acquired a position in a mezzanine loan backed by a portfolio of 13 luxury hotels (*i.e.*, the Mezzanine Loan). Of the 13 hotels, three were located in Puerto Rico—the El San Juan Hotel & Casino in Puerto Rico, the el Conquistador Golf Resort & Casino in Fajardo, and the Condado Plaza Hotel & Casino in San Juan.  The portfolio of 13 luxury hotels backed $742.5 million of debt securitized through the Wachovia Bank Commercial Mortgage Trust, 2007-WHALE8 (the "2007-WHALE8 Trust").

47.     As Puerto Rico's economy declined, the 2007-WHALE8 Trust suffered.  On August 20, 2012, Moody's downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Specifically, the LXR-1 class of the Trust was downgraded from B2 to Caa1, and the LXR-2 class was downgraded from Caa1 to Caa3. According to Moody's, a rating of "Caa" means that the obligations "are judged to be speculative of poor standing and are subject to very high credit risk." The addition of a numerical modifier "1 indicates that the obligation ranks in the higher end of its generic rating category; . . . and the modifier 3 indicates a ranking in the lower end of that generic rating category."

48.    In or around September 2012, Blackstone, the owner of the hotels within the portfolio, was unable to meet its payment obligations to its specialty servicer, CWCapital Asset Management.  Accordingly, Blackstone entered into a forbearance agreement.  Pursuant to the terms of the agreement, Blackstone would need to sell its hotels before March 24, 2014, and then refinance the remaining debt before maturity on September 9, 2014.

49.    Fitch Ratings also downgraded the 2007-WHALE8 Trust. According to a May 1, 2014 release by Fitch, 68% of the 2007-WHALE 8 Trust was composed of the LXR Hospitality Pool, which included the Puerto Rican hotels, described above. The Fitch Ratings release noted that only eight of the original hotels remained as of May 1, 2014. Fitch described the LXR portfolio accordingly:

> ***Performance overall is significantly below issuance expectations*** and the loan transferred to the special servicer in April 2012 in advance of its June 2012 maturity. In September 2012 the special servicer entered into a Forbearance Extension and Property Disposition Agreement with the Borrower. The plan requires certain properties to be sold or refinanced by specific dates to repay principal, and requires the special servicer to trap all excess cash flow generated from the properties for further principal reduction. The loan de-levered since Fitch's last rating action with the sale of the two properties and additional principal paydown from trapped excess cash flow. Four properties (out of the original 12 at issuance) have been sold to date. The Fitch adjusted net operating income (NOI) year-ended (YE) 2013 for the eight remaining properties has improved from YE 2012 by over 24%. The current NOI remains significantly lower than that at issuance.

(Emphasis added.) Fitch rated the LXR-1 and LXR-2 classes "Csf." According to Fitch Ratings, a structured finance product rating of "C" represents "Exceptionally high levels of credit risk" in which "[d]efault appears imminent or inevitable."

50.    By April 2015, the LXR-2 class of the 2007-WHALE8 Trust was backed by only four hotels: the three hotels in Puerto Rico listed above and The Boulders Resort & Golden Door Spa in Carefree, Arizona. On April 23, 2015, Fitch upgraded the LXR-2 class from CCsf to Bsf. In connection with the ratings upgrade, Fitch noted that the Boulders Resort was "under contract

14

for sale with an anticipated closing date at the end of April 2015, with proceeds sufficient to repay the non-pooled LXR-2 rake bond in full on the May payment date." Essentially, the class within the 2007-WHALE8 Trust that contained the three Puerto Rican hotels securing Resource Capital's mezzanine loan position was upgraded only when the sale of the other remaining property was nearly closed, providing sufficient funds to repay the class's obligation.

51.    As properties from the portfolio were sold off in order to repay principal, Resource Capital's Mezzanine Loan became increasingly riskier due to its over-concentration in Puerto Rico and complete dependency upon Puerto Rico's economy.

**D.    <u>Defendants Misrepresented Resource Capital's Exposure to Puerto Rico</u>**

52.    Throughout the Class Period, the Company made a number of material misleading statements and/or omissions concerning its exposure to the Puerto Rican economy.  Indeed, despite numerous events reflecting the severe decline of the Puerto Rican economy and Puerto Rico's credit, Resource Capital failed to disclose the risks that it had become subjected to by way of its investment in the Mezzanine Loan.  Further, Resource Capital misrepresented the adequacy of its disclosure controls.

**(1)    October 31, 2012—Earnings Call**

53.    On October 31, 2012, Resource Capital held a conference call with stock analysts to discuss the Company's third quarter 2012 financial performance.

54.    During the call, Defendant Cohen stated the following:

> Our portfolio of loans continued to perform well. During 2012, we have grown our real estate loan portfolio by over $150 million net. We expect this trend to continue as we continue to find good opportunities to lend money against good real estate. We have greatly strived to grow our origination channel in real estate and we believe that the investments we have made in our team and systems will start to pay off.
>
> While our portfolio stayed constant for the quarter due to repayments from a legacy $28 million loan, legacy meaning made before the crisis, and another $6.5

million loan made in 2011, we underwrote and funded a series of, in my opinion, very attractive loans. We are picking up pace and expect this portfolio to grow tremendously in the next few quarters, net of payoffs. Dave Bloom will elaborate on this in the real estate portfolio momentarily.

55.     Additionally, Defendant Bloom stated the following:

Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes. The majority of the properties securing our loans are continuing to realize improved cash flow on a quarter-over-quarter basis. And the entire portfolio remains performing with no defaults. As assets are recapitalized or sold and paid off, the few legacy positions that require extra asset management attention grows smaller each quarter. And we remain extremely focused on the ultimate resolution of the limited number of situations.

56.     The statements in Paragraphs 54-55 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By October 31, 2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. In light of the true status of the Mezzanine Loan, Defendant Cohen's description that the Company's loan portfolios were "performing well" was materially misleading. Further, Defendant Bloom's statements concerning the Company's "legacy positions," which included the Mezzanine Loan, and representations that the Company's "entire portfolio remains performing with no defaults" were also materially misleading. Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

16

57.     These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.    This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

### (2)     November 9, 2012—Form 10-Q

58.     On November 9, 2012, Resource Capital filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2012 (the "November 9, 2012 10-Q"). Defendants Cohen and Bryant signed the November 9, 2012 10-Q on behalf of themselves and the Company.

59.     The November 9, 2012 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Specifically, the November 9, 2012 10-Q incorporated the "Risk Factors" disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2011 (the "2011 10-K"). While the 2011 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. The November 9, 2012 10-Q (by incorporating the 2011 10-K) provided the following risk disclosure:

> *Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations*
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. . . . Where we have any kind of concentration risk in our investments, an adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

17

60.     The statement identified in Paragraph 59 was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the November 9, 2012 10-Q, Puerto Rico was already experiencing a historic economic downturn. By November 9, 2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

61.     This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

62.     Similarly, the November 9, 2012 10-Q also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

***Commercial Real Estate Loans***

18

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2012:** | | | | | | |
| Whole loans | $ 415,782 | $ 7,000 | $ 98,874 | $ — | $ 34,000 | $ 555,656 |
| B notes | 16,357 | — | — | — | — | 16,357 |
| Mezzanine loans | 23,322 | — | 44,500 | — | — | 67,822 |
| | $ 455,461 | $ 7,000 | $ 143,374 | $ — | $ 34,000 | $ 639,835 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $ 329,085 | $ 87,598 | $ 90,225 | $ 37,765 | $ — | $ 544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
| | $ 368,867 | $ 87,598 | $ 134,752 | $ 37,765 | $ — | $ 628,982 |

All of the Company's commercial real estate loans were performing as of September 30, 2012 and December 31, 2011.

63.   The statements in Paragraph 62 were materially misleading because they mischaracterized the credit quality of the Mezzanine Loans and omitted material information concerning the weakness of the Mezzanine Loan and the risks it created for the Company. The $44.500 million in mezzanine loans represented by the Company as "Rating 3" as of September 30, 2012 (which consisted of the Mezzanine Loan) was essentially unchanged from the $44.509 million represented by the Company as "Rating 3" as of June 30, 2012, $44.517 million as of March 31, 2012, and $44.527 million as of December 31, 2011, notwithstanding that Blackstone had entered into a forbearance agreement and the Company had stopped receiving cash income

19

from the loan in September 2012. Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the November 9, 2012 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of September 30, 2012[.]"  The Company represented this despite the fact that by November 9, 2012, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan).  Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

64.     Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.   This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

65.     Similarly, the November 9, 2012 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis.  17 C.F.R. §229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  Resource Capital should have disclosed its exposure to the

Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

66.    Finally, the November 9, 2012 10-Q misled investors with respect to the Company's then-existing internal controls. The November 9, 2012 10-Q was accompanied by certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Cohen and Bryant, respectively ("SOX Certifications"). Specifically, the certifications provided the following:

1.  I have reviewed this report on Form 10-Q for the quarter ended September 30, 2012 of Resource Capital, Corp.;

2.  **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

21

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

67.    The statements in bold faced in Paragraph 66 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available

22

to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

### (3)  March 5, 2013—Earnings Call

68.  On March 5, 2013, Resource Capital held a conference call with stock analysts to discuss the Company's fourth quarter and full year 2012 financial performance.

69.  During the call, Defendant Cohen stated the following:

Our credit quality is stable and improving and other than the legacy loans we have sold in our syndicated bank loan facility, we feel like the credit environment for us is excellent. We took a modest provision on real estate loans in fourth quarter of $400,000. However, all 43 of our outstanding real estate loans are performing and we see a trend of improving property performance underlying these loans beginning in 2011 through the year-end 2012 and continuing into 2013. That is, our real estate loss is shrinking.

. . .

Our liquidity remains excellent. We had approximately $180 million of cash including $94 million of unrestricted cash as of December 31, even after making considerable investment during the quarter. Stay tuned for more investments. Our portfolio of real estate loans continued to perform well. During 2012, we have grown our real estate loan portfolio by over $175 million. We expect this trend to continue as Dave Bloom and his real estate team continue to find out good opportunities from that money against good real estate. We have generally strived to grow our origination channel and we believe that the investments we have made in our team and system, will start to pay off or have started to pay off and will continue to start to pay off.

70.  The statements in Paragraph 69 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By March 5, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying

23

the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

71.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

### (4)    March 18, 2013—Form 10-K

72.    On March 18, 2013, Resource Capital filed an annual report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K"). Defendants Cohen and Bryant signed the 2012 10-K on behalf of themselves and the Company.

73.    The 2012 10-K was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. While the 2012 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2012 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The 2012 10-K provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we

24

may be affected by sector-specific economic or other problems that are not *reflected in the national economy generally* or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added.)

74.    The 2012 10-K also contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to Puerto Rico:



**Geographic Area by State**

75.    The statements identified in Paragraphs 73-74 were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis. Not only did Resource Capital's 2012 10-K completely withhold the fact that it was even invested in Puerto Rico, but as disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the 2012 10-K, Puerto Rico

was in the midst a historic economic downturn. By March 18, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

76.    This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

77.    Similarly, the 2012 10-K also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

### Commercial Real Estate Loans

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of

26

interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $  427,456 | $  — | $  106,482 | $  — | $  34,000 | $  567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
|  | $  482,079 | $  — | $  150,972 | $  — | $  34,000 | $  667,051 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $  329,085 | $  87,598 | $  90,225 | $  37,765 | $  — | $  544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
|  | $  368,867 | $  87,598 | $  134,752 | $  37,765 | $  — | $  628,982 |

All of our commercial real estate loans were performing as of December 31, 2012 and 2011.

78.    The statements in Paragraph 77 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Remarkably, the $44.490 million in mezzanine loans represented by the Company as "Rating 3" as of December 31, 2012 was essentially unchanged from the $44.500 million represented by the Company as "Rating 3" as of September 30, 2012. Resource Capital maintained its prior rating on the mezzanine loan despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued. Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the 2012 10-K was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of December 31, 2012[.]"  The Company represented this despite the fact that by March 18, 2013, the date the above statements

27

were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

79. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

80. Similarly, the 2012 10-K also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

81. Finally, the 2012 10-K misled investors with respect to the Company's then-existing internal controls. The 2012 10-K was accompanied by SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

1. I have reviewed this report on Form 10-K for the year ended December 31, 2012 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

29

registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

   b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

82.    The statements in bold faced in Paragraph 81 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

### (5)    May 8, 2013—Earnings Call

83.    On May 8, 2013 Resource Capital held a conference call with stock analysts to discuss the Company's first quarter 2013 financial performance.

30

84.    During the call, Defendant Cohen stated the following:

Our portfolio of real estate loans continue to perform well. During the last 12 months we have grown our real estate loan portfolio by over $223 million on a gross origination basis. We expect this trend to continue as our real estate debt team continues to find good opportunities to lend money against good real estate. We have greatly strived to grow our origination channel and we believe the investments we have made in our team and systems will start to pay off.

85.    During the call, Defendant Bloom stated the following:

We note improving metrics across all asset classes with the majority of the properties securing our loans realizing improved cash flow year-over-year and continuing to trend in an upward direction. In addition we are pleased to see that the majority of the asset-specific business plans across the portfolio are well on track and progressing towards the realization of borrowers' plans for value creation and the entire portfolio remains performing with no defaults.

86.    The statements in Paragraphs 84-85 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By May 8, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

87.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

31

### (6)    May 10, 2013—Form 10-Q

88.    On May 10, 2013, Resource Capital filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2013 (the "May 10, 2013 10-Q"). Defendants Cohen and Bryant signed the May 10, 2013 10-Q on behalf of themselves and the Company.

89.    The May 10, 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Specifically, the May 10, 2013 10-Q incorporated the "Risk Factors" disclosed in the 2012 10-K. While the 2012 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the disclosure portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The May 10, 2013 10-Q (by incorporating the 2012 10-K) provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not ***reflected in the national economy generally*** or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added.)

90.    The statement identified in Paragraph 89 was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As

disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the May 10, 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn. By May 10, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

91.    This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

92.    Similarly, the May 10, 2013 10-Q also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company designates loans that are sold after the period end at

the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31, 2013** | | | | | | |
| Whole loans | $ 497,052 | $ — | $ 53,362 | $ — | $ — | $ 550,414 |
| B notes | 16,293 | — | — | — | — | 16,293 |
| Mezzanine loans | 44,704 | — | 38,072 | — | — | 82,776 |
| | $ 558,049 | $ — | $ 91,434 | $ — | $ — | $ 649,483 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of the Company's commercial real estate loans were performing as of March 31, 2013 and December 31, 2012.

93.    The statements in Paragraph 92 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Remarkably, the $38.072 million in mezzanine loans represented by the Company as "Rating 3" as of March 31, 2013 maintained the same rating on the Puerto Rico mezzanine loan position. Resource Capital maintained its prior rating on the mezzanine loan despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued. Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the May 10, 2013 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of March 31, 2013 and December 31, 2012." The Company

represented this despite the fact that by May 10, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

94. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

95. Similarly, the May 10, 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

96. Finally, the May 10, 2013 10-Q misled investors with respect to the Company's then-existing internal controls. The May 10, 2013 10-Q was accompanied by SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

1. I have reviewed this report on Form 10-Q for the quarter ended March 31, 2013 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

36

registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

    b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

97.    The statements in bold face in Paragraph 96 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

### (7)    August 7, 2013—Earnings Call

98.    On August 7, 2013, Resource Capital held a conference call with stock analysts to discuss the Company's second quarter 2013 financial performance.

99.     During the call, Defendant Bloom stated the following:

Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes. The majority of the properties securing our loans are continuing to realize improved cash flow and we are seeing borrowers' plans for value creation on or ahead of budget. Once again I am pleased to report that the entire portfolio is performing with no defaults.

100.    During the call, Defendant Bryant stated the following:

Overall real estate credit has been excellent and to reiterate Jonathan's point, I characterize our bank loan portfolio credit as improving. Five bank loans totaling $12.6 million are delinquent out of a total portfolio of $1.1 billion and remarkably, all of our 49 real estate loans are current and performing.

101.    The statements in Paragraphs 99-100 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By August 7, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

102.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

38

### (8)    August 9, 2013—Form 10-Q

103.    On August 9, 2013, Resource Capital filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2013 (the "August 9, 2013 10-Q"). Defendants Cohen and Bryant signed the August 9, 2013 10-Q on behalf of themselves and the Company.

104.    The August 9, 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Specifically, the August 9, 2013 10-Q incorporated the "Risk Factors" disclosed in the 2012 10-K. While the 2012 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2012 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The August 9, 2013 10-Q (by incorporating the 2012 10-K) provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not ***reflected in the national economy generally*** or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added.)

105.    The statement identified in Paragraph 104 was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As

disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the August 9, 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn. By August 9, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

106. This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

107. Similarly, the August 9, 2013 10-Q also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

*Commercial Real Estate Loans*

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period

40

end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2013** | | | | | | |
| Whole loans | $ 553,333 | $ — | $ 55,374 | $ — | $ — | $ 608,707 |
| B notes | 16,265 | — | — | — | — | 16,265 |
| Mezzanine loans | 28,938 | — | 38,072 | — | — | 67,010 |
| | $ 598,536 | $ — | $ 93,446 | $ — | $ — | $ 691,982 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of the Company's commercial real estate loans were performing as of June 30, 2013 and December 31, 2012.

108.    The statements in Paragraph 107 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Remarkably, the $38.072 million in mezzanine loans represented by the Company as "Rating 3" as of June 30, 2013 maintained the same rating on the Puerto Rico mezzanine loan position. Resource Capital maintained its prior rating on the mezzanine loan despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued. Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the August 9, 2013 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of June 30, 2013 and December 31, 2012."  The Company represented

41

this despite the fact that by August 9, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

109.    Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

110.    Similarly, the August 9, 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

111.    The August 9, 2013 10-Q also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of June 30, 2013:

*Troubled- Debt Restructurings*
The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

42

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance | |
|---|---|---|---|---|---|
| **Three Months Ended June 30, 2013:** | | | | | |
| Whole loans | — | $ | — | $ | — |
| B notes | — | | — | | — |
| **Mezzanine loans** | — | | — | | — |
| Bank loans | — | | — | | — |
| Loans receivable - related party | — | | — | | — |
| Total loans | — | $ | — | $ | — |
| | | | | | |
| **Three Months Ended June 30, 2012:** | | | | | |
| Whole loans | — | $ | — | $ | — |
| B notes | — | | — | | — |
| **Mezzanine loans** | — | | — | | — |
| Bank loans | — | | — | | — |
| Loans receivable | — | | — | | — |
| Loans receivable - related party | — | | — | | — |
| Total loans | — | $ | — | $ | — |
| **Six Months Ended June 30, 2013:** | | | | | |
| Whole loans | 2 | $ | 56,328 | $ | 56,328 |
| B notes | — | | — | | — |
| **Mezzanine loans** | — | | — | | — |
| Bank loans | — | | — | | — |
| Loans receivable - related party | 1 | | 6,592 | | 6,592 |
| Total loans | 3 | $ | 62,920 | $ | 62,920 |
| | | | | | |
| **Six Months Ended June 30, 2012:** | | | | | |
| Whole loans | 3 | $ | 92,912 | $ | 76,597 |
| B notes | — | | — | | — |
| **Mezzanine loans** | — | | — | | — |
| Bank loans | — | | — | | — |
| Loans receivable | — | | — | | — |
| Loans receivable - related party | 1 | | 7,797 | | 7,797 |
| Total loans | 4 | $ | 100,709 | $ | 84,394 |

As of June 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.

112.    The statements identified in Paragraph 111 above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts

43

that the Company would be able to recover from its real estate loan investments. As the Company disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments was actually $41.1 million. Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the August 9, 2013 10-Q actually gave investors the impression that quality of Resource Capital's mezzanine loan portfolio improved compared to the previous quarter, which disclosed a single TDR of $38.072 million. This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by August 9, 2013. Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

113.    This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.   This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

114.    Finally, the August 9, 2013 10-Q misled investors with respect to the Company's then-existing internal controls. The August 9, 2013 10-Q was accompanied by SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

> 1.  I have reviewed this report on Form 10-Q for the quarter ended June 30, 2013 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

45

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

   b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

115. The statements in bold face in Paragraph 114 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

**(9)    November 6, 2013—Earnings Call**

116. On November 6, 2013, Resource Capital held a conference call with stock analysts to discuss the Company's third quarter 2013 financial performance.

117. During the call, Defendant Bloom stated the following:

46

We are improving metrics across all asset classes with the majority of the property securing our loans realizing improved cash flow on a year-over-year basis and continuing to trend in upward direction. In addition, we are pleased to see that the majority of the asset specific plans across the portfolio are well on track and progressing towards realization ultimately of the borrowers' plans for value creation and the entire portfolio remains performing with no defaults. We are very particular about markets in which we lend, sponsor quality and asset-specific business plans and the resilience of the assets I just described is a daily reminder that validates our keen focus on credit first approach to our business.

118.    During the call, Defendant Bryant stated the following:

Overall, real estate credit has been excellent and I characterize the bank loan portfolio credit as very benign. Three bank loans totaling $3.6 million are delinquent out of a portfolio of approximately $940 million and remarkably, all of our real estate loans are current and performing.

119.    The statements in Paragraphs 117-18 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By November 6, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

120.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource

47

Capital stock.   This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

### (10)    November 12, 2013—Form 10-Q

121.    On November 12, 2013, Resource Capital filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2013 (the "November 12, 2013 10-Q"). Defendants Cohen and Bryant signed the November 12, 2013 10-Q on behalf of themselves and the Company.

122.    The November 12, 2013 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Specifically, the November 12, 2013 10-Q incorporated the "Risk Factors" disclosed in the 2012 10-K. While the 2012 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2012 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The November 12, 2013 10-Q (by incorporating the 2012 10-K) provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not ***reflected in the national economy generally*** or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added.)

123.   The statement identified in Paragraph 122 was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the November 12, 2013 10-Q, Puerto Rico was already experiencing a historic economic downturn. By November 12, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

124.   This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

125.   Similarly, the November 12, 2013 10-Q also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

*Commercial Real Estate Loans*

49

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2013** | | | | | | |
| Whole loans | $ 591,105 | $ 44,943 | $ 32,067 | $ — | $ — | $ 668,115 |
| B notes | 16,238 | — | — | — | — | 16,238 |
| Mezzanine loans | 57,574 | — | — | — | — | 57,574 |
| | $ 664,917 | $ 44,943 | $ 32,067 | $ — | $ — | $ 741,927 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012.

126. The statements in Paragraph 125 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the November 12, 2013 10-Q represented all of the Company's mezzanine loan portfolio under its best credit risk category, Rating 1. The Company represented this despite the fact that by November 12, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not

50

receiving cash income from the loan). Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio. The Company represented this despite the fact that by November 12, 2013, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

127. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

128. Similarly, the November 12, 2013 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

51

129.    The November 12, 2013 2013 10-Q also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of September 30, 2013:

*Troubled- Debt Restructurings*
The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended September 30, 2013:** | | | |
| Whole loans | 2 | $ 48,374 | $ 52,716 |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 2 | $ 48,374 | $ 52,716 |
| | | | |
| **Three Months Ended September 30, 2012:** | | | |
| Whole loans | 2 | $ 42,550 | $ 42,550 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 3 | $ 80,622 | $ 80,622 |
| **Nine Months Ended September 30, 2013:** | | | |
| Whole loans | 4 | $ 104,702 | $ 109,044 |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 5 | $ 111,294 | $ 115,636 |
| | | | |
| **Nine Months Ended September 30, 2012:** | | | |
| Whole loans | 5 | $ 168,708 | $ 151,422 |
| B notes | — | — | — |
| **Mezzanine loans** | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 7 | $ 214,577 | $ 197,291 |

As of September 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.

130. The statements identified in bold face in Paragraph 129 above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As the Company disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments was actually $41.1 million. Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the November 12, 2013 10-Q actually gave investor's the impression that quality of Resource Capital's mezzanine loan portfolio improved compared to the previous year, which disclosed a single TDR of $38.072 million. This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by November 12, 2013. Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

131. This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

132. Finally, the November 12, 2013 10-Q misled investors with respect to the Company's then-existing internal controls. The November 12, 2013 10-Q was accompanied by

SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

1. I have reviewed this report on Form 10-Q for the quarter ended September 30, 2013 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of

54

the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Emphasis added.)

133.     The statements in bold face in Paragraph 132 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and

would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

### (11) February 26, 2014—Earnings Call

134. On February 26, 2014, Resource Capital held a conference call with stock analysts to discuss the Company's fourth quarter and full year 2013 financial performance.

135. During the call, Defendant Bryant stated the following:

We added 700,000 to our real estate loan reserve primarily for our previously impaired loan. Overall, real estate credit has been excellent and I characterized our bank loan portfolio as very benign. Three bank loans totaling $3.6 million are delinquent out of a portfolio of $580 million and all 57 of our real estate loans are current and performing.

136. The statements in Paragraph 135 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By February 26, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

137. These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

56

**(12)  March 3, 2014—Form 10-K**

138.  On March 3, 2014, Resource Capital filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2014 (the "2013 10-K"). Defendants Cohen, Bryant, and Blackwell signed the 2013 10-K on behalf of themselves and the Company.

139.  The 2013 10-K was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. While the 2013 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2013 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The 2013 10-K provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not ***reflected in the national economy generally*** or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added.)

140.  The 2013 10-K also contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to Puerto Rico:

57



**Geographic Area by State**

141.    The 2013 10-K's Management Discussion and Analysis section contained the following statement, which similarly misrepresented Resource Capital's real estate-related assets as solely located in the United States and that all necessary provisions for loan loss and impairments had been made by the Company:

> ***Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers***.  Over a period of several years, we entered into loan modifications with respect to 17 of our outstanding commercial real estate loans.  During the past three years, we have added to our provision for loan losses to reflect the effect of these conditions on our borrowers and have recorded both temporary and other than temporary impairments in the market valuation of CMBS and ABS in our investment portfolio.  However, during 2012 and into December 31, 2013, the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly for 2013. We expensed provisions of $3.0 million for the year ended December 31, 2013 as compared to provisions of $16.8 million for the year ended December 31, 2012. Our asset

impairments have increased slightly, we recognized asset impairments of $863,000 for the year ended December 31, 2013 as compared to $180,000 for the year ended December 31, 2012. We also saw a marked improvement in other comprehensive income with respect to our available for sale securities portfolio and interest rate derivatives, which declined to a loss of $14.0 million at December 31, 2013 from a loss of $27.1 million at December 31, 2012. While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2013, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

142. The statements identified in Paragraphs 139-41 were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis. Not only did Resource Capital's 2013 10-K completely withhold the fact that it was even invested in Puerto Rico, but as disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the 2013 10-K, Puerto Rico was in the midst a historic economic downturn. By March 3, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

143. This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

144.    Similarly, the 2013 10-K also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

### Commercial Real Estate Loans

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating.  We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |
| | | | | | | |
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of our commercial real estate loans were performing as of December 31, 2013 and 2012.

145.    The statements in Paragraph 144 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the 2013 10-K represented all of the Company's mezzanine loan portfolio under its

best credit risk category, Rating 1. The Company represented this despite the fact that by March 3, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio. The Company represented this despite the fact that by March 3, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan). Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

146. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

147. Similarly, the 2013 10-K also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral

within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

148.    The 2013 10-K also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of December 31, 2013:

*Troubled-Debt Restructurings*
The following tables show troubled-debt restructurings in our loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Year Ended December 31, 2013:** | | | |
| Whole loans | 5 | $ 143,484 | $ 147,826 |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 6 | $ 150,076 | $ 154,418 |
| | | | |
| **Year Ended December 31, 2012:** | | | |
| Whole loans | 6 | $ 143,261 | $ 126,946 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 8 | $ 189,130 | $ 172,815 |

As of December 31, 2013 and 2012, there were no troubled-debt restructurings that subsequently defaulted.

149.    The statements identified in bold face in Paragraphs 148 above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments.

62

As the Company disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments was actually $41.1 million. Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the 2013 10-K actually gave investor's the impression that quality of Resource Capital's mezzanine loan portfolio improved compared to the previous year, which disclosed a single TDR of $38.072 million. This was materially misleading because Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" by March 3, 2014. Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan.

150. This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

151. Finally, the 2013 10-K misled investors with respect to the Company's then-existing internal controls. The 2013 10-K was accompanied by SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

1. I have reviewed this report on Form 10-K for the year ended December 31, 2013 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the**

**circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial

reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

152. The statements in bold face in Paragraph 151 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

### (13)   May 7, 2014—Earnings Call

153. On May 7, 2014, Resource Capital held a conference call with stock analysts to discuss the Company's first quarter 2014 financial performance.

154. During the call, Defendant Cohen stated the following:

Our credit quality continues to be very solid, our real estate watch-list is shrinking and we reverse $4.6 million of the specific allowance in the first quarter as a result of the pending sale by the borrower on the property of a legacy the whole

65

loan that will pay down the existing balance and further reduce our legacy loan portfolio.

155.    During the call, Defendant Bloom stated the following:

Credit across the portfolio continues to trend in very positive direction, with improving metrics across all assets classes. The majority of the properties securing our loans are continuing to realize improved cash flow and receiving borrower's plans for value creation well on or ahead of track. Once again, I'm pleased to report that the entire commercial real estate loan portfolio is performing with no defaults.

156.    The statements in Paragraphs 154-55 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By May 7, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations." Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan. As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Additionally, as of May 1, 2014, Fitch Ratings downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

157.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

66

### (14)    May 9, 2014—Form 10-Q

158.    On May 9, 2014, Resource Capital filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2014 (the "May 9, 2014 10-Q"). Defendants Cohen and Bryant signed the May 9, 2014 10-Q on behalf of themselves and the Company.

159.    The May 9, 2014 10-Q materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

#### *Commercial Real Estate Loans*

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31 2014** | | | | | | |
| Whole loans | $ 768,243 | $ 32,500 | $ 33,110 | $ — | $ — | $ 833,853 |
| B notes | 16,168 | — | — | — | — | 16,168 |
| Mezzanine loans | 51,832 | 12,467 | — | — | — | 64,299 |
| | $ 836,243 | $ 44,967 | $ 33,110 | $ — | $ — | $ 914,320 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were performing as of March 31, 2014 and December 31, 2013.

160. The statements in Paragraph 159 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the May 9, 2014 10-Q represented all of the Company's mezzanine loan portfolio under its best credit risk category, Rating 1. The Company represented this despite the fact that by May 9, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

161. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

162. Similarly, the 2013 10-K also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral

68

within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

163. The May 9, 2014 10-Q also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of March 31, 2014:

*Troubled- Debt Restructurings*
**The Company had no troubled-debt restructurings during the three months ended March 31, 2014.**
The following table shows troubled-debt restructurings in the Company's loan portfolio (in thousands) during the three months ended March 31, 2013:

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| Whole loans | 6 | $ | 153,958 | $ 136,672 |
| B notes | — | | — | — |
| Mezzanine loans | 1 | | 38,072 | 38,072 |
| Bank loans | — | | — | — |
| Residential mortgage loans | — | | — | — |
| Loans receivable - related party | 1 | | 7,797 | 7,797 |
| Total loans | 8 | $ | 199,827 | $ 182,541 |

As of March 31, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.

(Emphasis added.)

164. The statements identified in bold face in Paragraphs 163 above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As the Company disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments alone was actually $41.1 million. Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the May 9, 2014 10-

Q actually gave investor's the impression that quality of Resource Capital's mezzanine loan portfolio improved compared to the previous year, which disclosed a single TDR of $38.072 million. In addition, the May 9, 2014 10-Q misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even though the Company did not receive any interest income (other than on an accrual basis) since September 2012.  The Company represented this despite the fact that by May 9, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."  Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

165.  Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.  This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

166.  Finally, the May 9, 2014 10-Q misled investors with respect to the Company's then-existing internal controls. The May 9, 2014 10-Q was accompanied by SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

70

1. I have reviewed this report on Form 10-Q for the quarter ended March 31, 2014 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

71

registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

167. The statements in bold face in Paragraph 166 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

72

### (15)    August 6, 2014—Earnings Call

168.    On August 6, 2014, Resource Capital held a conference call with stock analysts to discuss the Company's second quarter 2014 financial performance.

169.    During the call, Defendant Bloom stated the following:

We also note improving credit metrics across all asset classes represented in our commercial real estate portfolio. The majority of the properties securing our loans are continuing to realize improved cash flow with borrowers plans for value creation well on track. I'm once, again, pleased to report that the entire commercial real estate loan portfolio is performing with no defaults.

170.    During the call, Defendant Bryant stated the following:

Only one bank loan for $1.6 million is delinquent out of a portfolio of $765 million and again all of our real estate loans totaling $1,00,043,000 are current. Our leverage stands at 1.7 times at June 30. When we treat our TruPs issuances which have a remaining term of approximately 22 years as equity, our leverage is 1.6 times.

171.    The statements in Paragraphs 169-70 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By August 6, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

172.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and

73

would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

### (16)   August 8, 2014—Form 10-Q

173. On August 8, 2014, Resource Capital filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2014 (the "August 8, 2014 10-Q"). Defendants Bryant and Blackwell signed the August 8, 2014 10-Q on behalf of themselves and the Company.

174. The August 8, 2014 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Specifically, the August 8, 2014 10-Q incorporated the "Risk Factors" disclosed in the 2013 10-K. While the 2013 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2013 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The August 8, 2014 10-Q (by incorporating the 2013 10-K) provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not ***reflected in the national economy generally*** or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added.)

175.    The statement identified in Paragraph 174 was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the August 8, 2014 10-Q, Puerto Rico was already experiencing a historic economic downturn. By August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio. Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

176.    This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

177.    The August 8, 2014 10-Q also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

### Commercial Real Estate Loans

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2014** | | | | | | |
| Whole loans | $ 900,246 | $ 32,500 | $ 22,000 | $ — | $ — | $ 954,746 |
| B notes | 16,138 | — | — | — | — | 16,138 |
| Mezzanine loans | 45,460 | 21,800 | — | — | — | 67,260 |
| | $ 961,844 | $ 54,300 | $ 22,000 | $ — | $ — | $ 1,038,144 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were current as of June 30, 2014 and December 31, 2013.

178.    The statements in Paragraph 177 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the August 8, 2014 10-Q represented all of the Company's mezzanine loan portfolio

under its best credit risk category, Rating 1. The Company characterized the portfolio in this way despite the fact that by August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

179. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

180. Similarly, the August 8, 2014 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

77

181.   The August 8, 2014 10-Q also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of June 30, 2014:

*Troubled-Debt Restructurings*
***The Company had no troubled-debt restructurings during the three months ended June 30, 2014 and 2013 or during the six months ended June 30, 2014.***
The following table shows troubled-debt restructurings in the Company's loan portfolio during the six months ended June 30, 2013 (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| **Six Months Ended June 30, 2013** | | | | |
| Whole loans | 2 | $ | 56,328 | $ 56,328 |
| B notes | — | | — | — |
| Mezzanine loans | — | | — | — |
| Bank loans | — | | — | — |
| Residential mortgage loans | — | | — | — |
| Loans receivable - related party | 1 | | 6,592 | 6,592 |
| Total loans | 3 | $ | 62,920 | $ 62,920 |

As of June 30, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.

(Emphasis added.)

182.   The statements identified in bold face in Paragraphs 181 above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, and the actual amounts that the Company would be able to recover from its real estate loan investments. As the Company disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments alone was actually $41.1 million. In addition, the August 8, 2014 10-Q misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even though the Company did not receive any interest income (other than on an accrual basis) since September 2012. The Company represented this despite the fact that by August 8, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust

"due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

183. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

184. Finally, the August 8, 2014 10-Q misled investors with respect to the Company's then-existing internal controls. The August 8, 2014 10-Q was accompanied by SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

1. I have reviewed this report on Form 10-Q for the quarter ended June 30, 2014 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material

79

respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial**

80

> **reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Emphasis added.)

185.    The statements in bold face in Paragraph 184 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

### (17)    November 4, 2014—Earnings Call

186.    On November 4, 2014, Resource Capital held a conference call with stock analysts to discuss the Company's third quarter 2014 financial performance.

187.    During the call, Defendant Bloom stated the following:

I'm once again pleased to report that the entire commercial real estate portfolio is performing with no defaults.

188.    During the call, Defendant Bryan stated the following:

> Two bank loans for $2.3 million are delinquent out of a portfolio of $712 million, just 32 basis points, and all of our 65 real estate loans totaling $1.1 billion are current.

189.    The statements in Paragraphs 188 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By November 4, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

190.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.    This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

### (18)    November 10, 2014—Form 10-Q

191.    On November 10, 2014, Resource Capital filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2014 (the "November 10, 2014 10-Q"). Defendants Bryant and Blackwell signed the November 10, 2014 10-Q on behalf of themselves and the Company.

82

192.   The November 10, 2014 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Specifically, the November 10, 2014 10-Q incorporated the "Risk Factors" disclosed in the 2013 10-K. While the 2013 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2013 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The November 10, 2014 10-Q (by incorporating the 2013 10-K) provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not ***reflected in the national economy generally*** or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added.)

193.   The statement identified in Paragraph 192 was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the November 10, 2014 10-Q, Puerto Rico was already experiencing a historic economic downturn. By November 10, 2014, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan

performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio. Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

194. This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

195. The November 10, 2014 10-Q also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

### Commercial Real Estate Loans

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of

the loan collateral, the Company considers factors such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2014** | | | | | | |
| Whole loans | $ 990,471 | $ 32,500 | $ — | $ — | $ — | $ 1,022,971 |
| B notes | 16,107 | — | — | — | — | 16,107 |
| Mezzanine loans | 45,447 | 21,858 | — | — | — | 67,305 |
| | $ 1,052,025 | $ 54,358 | $ — | $ — | $ — | $ 1,106,383 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were current as of September 30, 2014 and December 31, 2013.

196.    The statements in Paragraph 195 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the November 10, 2014 10-Q represented mezzanine loans involving Puerto Rican assets under its best credit risk category, Rating 1, despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012, two years prior, as interest merely accrued. Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the November 10, 2014 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were current as of September 30, 2014 and December 31, 2013" despite the fact that the Company stopped receiving cash income from the loan in September 2012.   The Company characterized the portfolio in this way despite the fact that by November 10, 2014, the date the

above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

197.   Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

198.   Similarly, the November 10, 2014 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis. 17 C.F.R. §229.303(a)(3)(i). Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy. Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

199.   Finally, the November 10, 2014 10-Q misled investors with respect to the Company's then-existing internal controls. The November 10, 2014 10-Q was accompanied by

86

SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

1. I have reviewed this report on Form 10-Q for the quarter ended September 30, 2014 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of

87

the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

200. The statements in bold face in Paragraph 199 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

### (19)   February 26, 2015—Earnings Call

201.   On February 26, 2015, Resource Capital held a conference call with stock analysts to discuss the Company's fourth quarter and full-year 2014 financial performance.

202.   During the call, Defendant Bloom stated the following:

We will continue to utilize our $600 million term financing facilities to support the growth of our new loan originations and we plan to access the CLO market to optimally match-fund our assets on a regular basis. We note improving credit metrics across all asset classes represented in our commercial real estate loan portfolio, the majority of the properties securing our loans continuing to realize improved cash flow with borrowers' plans for value creation well on track. I am once again pleased to report the entire commercial real estate portfolio is performing with no defaults.

203.   During the call, Defendant Bryant stated the following:

Two bank loans 1.4 million are delinquent out of a portfolio of 323 million, 41 basis points and all 78 of our real estate loans are current. Of note, for Q4 we were able to sell off two remaining real estate properties for gains of 3.2 million bringing 2014 gains to 6.1 million.

204.   The statements in Paragraphs 202-03 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By February 26, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

205.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.    This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

### (20)    March 2, 2015—Form 10-K

206.    On March 2, 2015, Resource Capital filed the 2014 10-K. Defendants Cohen, Bryant, and Blackwell signed the 2014 10-K on behalf of themselves and the Company.

207.    The 2014 10-K was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. While the 2013 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure to the Puerto Rican economic crisis. Furthermore, the 2014 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The 2014 10-K provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not ***reflected in the national economy generally*** or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

90

(Emphasis added.)

208.    The 2014 10-K also contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to Puerto Rico:



209.    The 2014 10-K's Management Discussion and Analysis section contained the following statement, which similarly misrepresented Resource Capital's real estate-related assets as solely located in the United States and that all necessary provisions for loan loss and impairments had been made by the Company:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. Over a period of several years, we entered into loan modifications with respect to 14 of our remaining outstanding commercial real estate loans. During the past 21 months, we have adjusted our provision for loan losses to reflect the effect of these conditions on our borrowers as well as, where necessary, market-related temporary adjustments to the market valuations of both CMBS and ABS in our investment portfolio. However, during 2013 and continuing through December 31, 2014, ***the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly in***

> *2014*. For the year ended December 31, 2014, we have a net recovery in the provision for loan losses of $1.8 million, primarily due to the successful refinancing of a commercial real estate loan position on which we had previously established a significant reserve for credit loss. Also, other comprehensive income saw an increase of $20.1 million at December 31, 2014.  While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2014, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

(Emphasis added.)

210.    The statements identified in Paragraphs 207-09 were materially misleading in that they misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the 2014 10-K, Puerto Rico was already experiencing a historic economic downturn. By March 2, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."  Moreover, Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations.  As a result, Blackstone was actively looking to sell the assets underlying the 2007-WHALE8 Trust and, in turn, the Mezzanine Loan. Further, Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations."  Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.  Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

211.    These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and

92

would have been considered by shareholders when deciding whether to purchase Resource Capital stock.   This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

212.   Similarly, the 2014 10-K also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

### Commercial Real Estate Loans

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating.  We value loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |
| | | | | | | |
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of our commercial real estate loans were performing as of December 31, 2014 and 2013.

213. The statements in Paragraph 212 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the 2014 10-K represented all of the Company's mezzanine loans involving Puerto Rican Assets under its best credit risk category, Rating 1. The Company represented this despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued. Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the 2014 10-K was materially misleading by stating that all of Resource Capital's "commercial real estate loans were performing as of December 31, 2014 and December 31, 2013." The Company characterized the portfolio in this way despite the fact that by March 2, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

214. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that

94

Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

215.   Similarly, the 2014 10-K also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis.  17 C.F.R. §229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

216.   Finally, the 2014 10-K misled investors with respect to the Company's then-existing internal controls. The 2014 10-K was accompanied by SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

1.  I have reviewed this report on Form 10-K for the year ended December 31, 2014 of Resource Capital, Corp.;

2.  **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal

control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

96

217.     The statements in bold face in Paragraph 216 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, and the performance of the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

### (21)     May 6, 2015—Earnings Call

218.     On May 6, 2015, Resource Capital held a conference call with stock analysts to discuss the Company's first quarter 2015 financial performance.

219.     During the call, Defendant Bloom stated the following:

I am once again pleased to report that the entire commercial real estate loan portfolio is performing with no defaults. The broader real estate recovery has taken hold and we remain optimistic about fundamentals, but are cautiously on the lookout for markets that we feel are outpacing normal sustainable growth. The positive performance of our portfolio is a daily reminder that validates the credit first approach to lending and selectivity we apply to markets, asset classes and sponsors in our origination process.

220.     During the call, Defendant Bloom stated the following:

We ended the period with $4 million in commercial real estate allowances and $3.2 million in commercial financial allowances. With the loan exception of the one specific middle market position that began impaired our credit has been very good. One bank loan where a mere $251,000 is delinquent out of a portfolio of $298 million, all of our middle market loans are current and as Dave Bloom mentioned, all 79 of our real estate loans totaling $1.5 billion are current.

221.     The statements in Paragraphs 219-20 were materially misleading because they omitted and/or misrepresented the status of the Company's investment in the Mezzanine Loan. By May 6, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), and Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations." Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

222.     These misrepresentations were material because the truth concerning the status of the Mezzanine Loan would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.     This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

**(22)     May 11, 2015—Form 10-Q**

223.     On May 11, 2015, Resource Capital filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2015 ("May 11, 2015 10-Q"). Defendants Bryant and Blackwell signed the May 11, 2015 10-Q on behalf of themselves and the Company.

224.     The May 11, 2015 10-Q was materially misleading as to the already-materialized facts arising from Resource Capital's exposure to Puerto Rico within its commercial real estate loan portfolio. Specifically, the May 11, 2015 10-Q incorporated the "Risk Factors" disclosed in the 2014 10-K. While the 2014 10-K admitted that certain geographic concentrations could affect the performance of the Company's investments, it omitted to disclose the Company's exposure

98

to the Puerto Rican economic crisis. Furthermore, the 2014 10-K portrayed the geographic distribution of the portfolio as limited to the mainland United States, thereby omitting to disclose any exposure to the Puerto Rican economic crisis. The May 11, 2015 10-Q (by incorporating the 2014 10-K) provided the following risk disclosure:

> ***Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.***
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties. We also may have material concentrations in the property types and industry sectors that are in our loan portfolio. Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not ***reflected in the national economy generally*** or in more diverse portfolios. An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added.)

225.    The statement identified in Paragraph 224 was materially misleading in that it misrepresented the Company's existing exposure to the Puerto Rican economic crisis. As disclosed by the Company on August 5, 2015, Resource Capital's Puerto Rican investments dated back to as early as 2007. As of the date of the May 11, 2105 10-Q, Puerto Rico was already experiencing a historic economic downturn. By May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being

sold.  Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.  Accordingly, Resource Capital's risk disclosure failed to accurately disclose to investors the fact that the Company's Puerto Rican investments had already materially negatively impacted the Company's financial position.

226.   This misrepresentation was material because the truth regarding Resource Capital's exposure to the Puerto Rican economic crisis would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.   This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

227.   The May 11, 2015 10-Q materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating the following, which omitted to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

### Commercial Real Estate Loans

The Company uses a risk grading matrix to assign grades to commercial real estate loans.  Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating.  The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|

100

| **As of March 31, 2015** | | | | | | |
|---|---|---|---|---|---|---|
| Whole loans | $ 1,329,882 | $ 32,500 | $ — | $ — | $ — | $ 1,362,382 |
| B notes | 16,031 | — | — | — | — | 16,031 |
| Mezzanine loans | 45,417 | 22,054 | — | — | — | 67,471 |
| | $ 1,391,330 | $ 54,554 | $ — | $ — | $ — | $ 1,445,884 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |

All of the Company's commercial real estate loans were current as of March 31, 2015 and December 31, 2014.

228. The statements in Paragraph 227 were false and misleading because they mischaracterized the credit quality of the mezzanine loans involving the Puerto Rican assets. Incredibly, the May 11, 2015 10-Q represented all of the Company's mezzanine loan portfolio under its best credit risk category, Rating 1. The Company misrepresented this fact despite the forbearance agreement entered into by Blackstone and the fact that the Company stopped receiving cash income from the loan in September 2012 as interest merely accrued. Indeed, the Company specifically noted payment history, collectability of interest, and loan terms as factors used to determine the credit rating of Resource Capital's loan portfolio. In addition, the May 11, 2015 10-Q was materially misleading by stating that all of Resource Capital's "commercial real estate loans were current as of March 31, 2015 and December 31, 2014." The Company characterized the portfolio in this way despite the fact that by May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust due to "[p]erformance overall" being "significantly below

101

issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being sold.

229.    Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.   This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

230.    Similarly, the May 11, 2015 10-Q also failed to comply with Item 303 of Regulation S-K by failing to disclose the Company's exposure to the Puerto Rican economic crisis.  17 C.F.R. §229.303(a)(3)(i).  Specifically, the Mezzanine Loan's increasing concentration of collateral within Puerto Rico subjected the Company to significant risks arising from the decline of the Puerto Rican economy.  Resource Capital should have disclosed its exposure to the Puerto Rican economy because it was likely to (and did) have a negative material impact on the Company's operations.

231.    The May 11, 2015 10-Q also misrepresented Resource Capital's mezzanine loan portfolio as not containing any troubled-debt restructurings as of March 31, 2015:

*Troubled-Debt Restructurings*
The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended March 31, 2015:** | | | |
| Whole loans | 2 | $ 67,459 | $ 67,459 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Middle market loans | — | — | — |

| | | | | | |
|---|---|---|---|---|---|
| Residential mortgage loans | — | | — | | — |
| Loans receivable - related party | — | | — | | — |
| Total loans | 2 | $ | 67,459 | $ | 67,459 |

> ***The Company had no troubled-debt restructurings during the three months ended March 31, 2014***. As of March 31, 2015 and 2014, there were no commercial real estate loan troubled-debt restructurings that subsequently defaulted.

(Emphasis added.)

232.     The statements identified in bold face in Paragraphs 231 above were materially misleading in that they misrepresented the Company's actual conduct with respect to evaluating loan losses, the Company's compliance with its policy(ies) for evaluating loan losses, the existence of a troubled-debt restructuring in the Company's mezzanine loan portfolio, and the actual amounts that the Company would be able to recover from its real estate loan investments. As the Company disclosed on August 5, 2015, the loan loss allowance for its Puerto Rican investments alone was actually $41.1 million. Moreover, by misrepresenting the Company's mezzanine loan portfolio as not containing any troubled debt restructurings, the May 11, 2015 10-Q actually gave investor's the impression that quality of Resource Capital's mezzanine loan portfolio improved compared to the previous quarter, which disclosed a single TDR of $38.072 million. In addition, the May 11, 2015 10-Q misrepresented that the Company's mezzanine loan portfolio did not contain any TDR, even though the Company did not receive any interest income (other than on an accrual basis) since September 2012. The Company represented this despite the fact that by May 11, 2015, the date the above statements were made, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations," Blackstone had already entered into a forbearance agreement with its servicer because it was unable to meet its payment obligations (which resulted in Resource Capital not receiving cash income from the loan), Fitch Ratings had downgraded the 2007-WHALE8 Trust

103

due to "[p]erformance overall" being "significantly below issuance expectations," and the only remaining non-Puerto Rico asset was in the process of being sold. Ultimately, as announced at the end of the Class Period, Resource Capital's Mezzanine Loan would result in a $41.1 million impairment due to non-performing assets comprising the underlying portfolio.

233. Resource Capital's misrepresentations concerning the credit quality and risks relating to the Mezzanine Loan were material because the truth would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock. This is evidenced by the fact that Resource Capital's stock declined approximately 15% in response to the truth when it was revealed.

234. Finally, the May 11, 2015 10-Q misled investors with respect to the Company's then-existing internal controls. The May 11, 2015 10-Q was accompanied by SOX Certifications signed by Defendants Cohen and Bryant, respectively. Specifically, the certifications provided the following:

1. I have reviewed this report on Form 10-Q for the quarter ended March 31, 2015 of Resource Capital, Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as

defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

105

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

235. The statements in bold face in Paragraph 234 above were materially false and misleading in that they contained certifications as to (i) the quality of the Company's internal controls despite their failure and (ii) the completeness of the disclosures despite their omission of material facts, including but not limited to the Company's exposure to the Puerto Rican economic crisis, the credit quality of the Company's mezzanine loan portfolio, the performance of the Company's mezzanine loan portfolio, and the existence of a troubled debt restructuring in the Company's mezzanine loan portfolio. These misrepresentations were material because the truth regarding the Company's internal controls and completeness of Resource Capital's financial statements would have altered the total mix of information available to investors and would have been considered by shareholders when deciding whether to purchase Resource Capital stock.

E.     **Defendants Reveal the Truth after Taking a $41.1 Million Impairment**

236. After several years of failing to disclose Resource Capital's exposure to the Puerto Rican economy and the true credit risk profile of its mezzanine loan portfolio, the market finally learned of Resource Capital's hidden investments in August 2015.

(1)     **August 4, 2015—Press Release**

237. The truth finally began to emerge when on August 4, 2015, after the close of the market, Resource Capital announced its financial results for the quarter ended June 30, 2015. The Company disclosed GAAP net loss of $31.0 million during the quarter. Contributing to the net loss, indeed the cause thereof, was the Company's recording of an allowance for loan loss on a mezzanine loan position of $41.1 million in total. As disclosed in the August 4, 2015 press release, "[t]he last three luxury brand hotel properties securing the loan are located in or near San

106

Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved."

### (2)    August 5, 2015—Earnings Call

238.    On August 5, 2015, Resource Capital held a conference call with stock analysts to discuss the Company's second quarter 2015 earnings. During the call, several of the Individual Defendants addressed the Puerto Rico mezzanine loan position.

239.    Defendant Cohen discussed the Puerto Rico mezzanine loan, its impact, and described the Company's acquisition of the position:

[A] legacy mezzanine loan that we purchased in 2007, one of the last two mezzanine positions in our portfolio deteriorated suddenly due to its exposure to Puerto Rico and we were forced to impair that asset. We stopped investing in this type of loan in 2007 and the remaining mezzanine loan in our portfolio is a very good credit, a $7 million position secured by property in New York City and we expected to pay off within the next 18 months. This impairment causes our book value to decrease to $4.56 leaving us trading at approximately 78% of GAAP book value.

\*\*\*

Obviously a large and very disappointing element of our result this quarter was the loan loss reserve that we recognize on our position in a mezzanine loan whose borrower is an affiliate of one of the world's largest private equity firms. The loan we impair was one where we had a small percentage of a subordinated mezzanine position in a complicated multi-tranche $2.8 billion transaction that financed luxury hotels.

Our investment was purchased in 2007 at a very well capitalized and committed borrower went through several restructurings over the years to provide runway for the borrower to complete its business plan and we expected to be paid off when that happens.

But the last three assets are in Puerto Rico. The borrower's ability to favorably refinance its senior loans was impacted by economic and credit conditions in Puerto Rico and the new loan which closed in May meaningfully reduced the borrower's time to achieve its plan. On such highly leveraged transaction even small changes in value can have a large impact on the subordinated tranches which unfortunately is where we were.

Accordingly we have fully reserved for it.

240.    Later in the call, Bloom discussed the Puerto Rico mezzanine loan position further, acknowledging that the position essentially provided no benefit to the Company since September 2012:

> Jonathan addressed the specific reserve that we took this quarter on a mezzanine loan that was part of a very large multi-tranche financing that included a $1.3 billion first mortgage and $625 million of mezzanine debt split into eight tranches, many with multiple participants and over $830 million of borrower act equity into the transaction. It's important note that this loan dates back to mid-2007 and *was restructured and amended in 2012 and since that time, interest was on an accrual basis, so it has not contributed to our income since September of 2012 in any meaningful way.*
>
> Pursuant to the terms of the extension the loan has not come due, nor is it in default, that said in the ordinary course of closing our quarters we review all of our loan positions and *after a review of the subject transaction the determination was made to impair the position in the current quarter as we have serious doubts about the ultimate collectability of the loan upon maturity*. That said, markets can change suddenly and with almost a year until the loan matures, no one can be absolutely certain about the ultimate resolution of this impaired loan.
>
> By way of brief history RSO's commercial real estate business plan has always been to directly originate, floating rate whole loans unlikely transitional properties across the country. Having commenced operations in mid-2005 during the time that we were building out our national origination team, we still recognized relative value in certain mezzanine loans and B note investments. Markets were extremely liquid and the majority of these subject positions paid off in relatively short order, that said we were always cognizant of the fact that multi-tranche debt transactions involved other lenders which results in a lack of unilateral control should a problem arise.

(Emphasis added.)

241.    During the question-and-answer portion of the call, Defendants Cohen and Bloom engaged in a discussion with Steve Delaney, an analyst from JMP Securities, relating to the Puerto Rico mezzanine loan position and recognized the previously undisclosed risk associated with a mezzanine loan secured by real estate located in the embattled Commonwealth of Puerto Rico, as follows:

DeLaney:

108

Good morning John. I know this is a tough call for you guys and I appreciate you stepping up addressing the stock situation right upfront for us. Thank you. I'd like to clarify for starters not that -- we'll come back to those large mez loans but at March you were carrying 67.5 million of mez loans with the 38 million impaired suggesting maybe 29 million to 30 million of other mez loans. Now I wanted to compare that you mentioned there was one remaining of 7 million in New York. Can you just clarify what is left in the mez bucket beyond this hotel loan?

Bloom:
Steve, this is Dave, let me reconcile that for you. So you're right it was 67 less 38 gets you to about 29, about 13 paid off in Q2 on one position. And another nine or nine and half paid off in July right after the quarter ended. So that's why we're now left with little over seven from that one position.

DeLaney:
That's helpful. Appreciate you clarifying that and the characteristics of the remaining seven and look we recognize you guys have done an amazing job over last two or three years just shedding mez where you could and just getting back to the large problematic loan. I guess it sounds like to me that it was a combination of both the structure, the original loan structure, and what became sort of an idiosyncratic situation with respect to what you ended up with as residual credit, and that's really the only question I have is you started off with 13 loans and *it sounds like you're ending up with three loans that are, happen to be in Puerto Rico, you used the term the last loans*. So help me understand as payoffs were made collateral was released; did you benefit from any of the pay down as these other 10 hotel properties were sold or did all that cash flow go to senior tranches. Let's start there?

Bloom:
To be clear the priority of payment is sequential so the senior loan is retired first and then tranches of mezzanine loan are retired in a specific order after that.

DeLaney:
Yeah, that's, that's what was going through my mind. *So, you end up going from, it's almost like adverse selection. The most liquid properties I guess, go out first and as a subordinate investor you're kind of left with, you're really lending on the weaker loans in the pool I guess and you acknowledge that that was the weakness in that structure and one reason why you guys ceased doing that business*. Okay, so and just to be clear there is three hotels left and they're all in Puerto Rico. Correct?

Bloom:
There are now two, they are all in Puerto Rico.

DeLaney:
So let me suggest this and maybe other analysts will have questions after this, but just a thought, this is very complicated. I think look, *there is a $0.31 hit to book*

109

that's all fine, we know you're not in this business, I think investors will like to make their own decision about the possibility of any type of recovery, it can't hurt you any more now, right? But a thought I had is -- because it is so detailed and involved, I think people might want to know, how many room keys, what RevPAR, would you at least consider, and you don't have to answer this, but I'm going to suggest that you consider putting in information piece together on the two loans or whatever you can disclose publicly and maybe put that out on an 8-K, and then sophisticated real estate investors can kind of draw their own conclusions as to whether there is any possibility of a recovery or what would have to develop, so just a suggestion there if I may.

Cohen:
This is Jonathan and thank you Steve and we will take that under consideration.

DeLaney:
You are very welcome. When you have these legacy situations, John, where you could end up in effect with a $40 million credit loss, is there any reach back on prior incentive fees that may have been paid, is there any adjustment to that for the benefit of shareholders, how would you and the Board address that if this becomes a real loss?

Cohen:
Well first of all we haven't, unfortunately for us made very many incentive fees over the years. So I don't think there is many to reach back to but obviously when it becomes real loss it goes into that calculation.

(Emphasis added.)

### (3)    August 7, 2015—Form 10-Q

242.    Following the close of the Class Period, on August 7, 2015, Resource Capital filed its quarterly report on Form 10-Q for the quarter ended June 30, 2015 (the "August 7, 2015 10-Q"). The August 7, 2015 10-Q included the following disclosure, which finally acknowledged (i) the Company's exposure to the Puerto Rican economy through its mezzanine loan position and (ii) the extent of the credit risk to the Company's mezzanine loan portfolio:

During the quarter ended June 30, 2015, the Company recorded an allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007. The outstanding loan balance of $38.1 million was fully reserved and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. An impairment analysis showed that the fair value of the underlying collateral

110

declined from that as of March 31, 2015. Contributing to this decline was a modification of the senior mortgage that accelerated the time horizon for disposing of the three remaining properties collateralizing the loan. ***Compounding this fact, the remaining three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that realizable values had declined rapidly and that the troubled debt restructuring should be fully reserved as of June 30, 2015***.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2015** | | | | | | |
| Whole loans | $1,467,901 | $ 32,500 | $ — | $ 2,202 | $ — | $1,502,603 |
| B notes | 15,997 | — | — | — | — | 15,997 |
| Mezzanine loans | 16,750 | — | — | 38,072 | — | 54,822 |
| | $1,500,648 | $ 32,500 | $ — | $ 40,274 | $ — | $1,573,422 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $1,231,092 | $ 32,500 | $ — | $ — | $ — | $1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $1,292,596 | $ 54,434 | $ — | $ — | $ — | $1,347,030 |

The Company had no delinquent commercial real estate loans as of June 30, 2015 and December 31, 2014.

(Emphasis added.)

243. Notably, the Company again changed the language used in connection with this disclosure—the August 7, 2015 10-Q stated that "[t]he Company had no delinquent commercial real estate loans" rather than affirmatively stating that all of the Company's loans were "current" or "performing," like all of Resource Capital's disclosures dating back to the beginning of the Class Period.

244. The Company also disclosed the effects of its allowance for loan loss associated with the Puerto Rico mezzanine loan position in the August 7, 2015 10-Q's Management Discussion and Analysis section, finally acknowledging publicly the effects of the Puerto Rican economy on its mezzanine loan investment:

111

Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. ***During the quarter ended June 30, 2015, the Company recorded a substantial allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007. The outstanding loan balance of $38.1 million was fully reserved, and associated accrued interest of $3.0 million was reversed against interest income for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan is impaired.*** In our bank and middle market loan portfolios, we recorded reserves of approximately $4.7 million for the six months ended June 30, 2015, which was primarily due to a significant increase in our middle market loan portfolio relating to a specific loan which had continued deterioration and defaulted in the second quarter of 2015. While we have recognized these losses in 2015, our credit quality on the balance of our loan portfolio is benign. In terms of delinquencies; only two bank loans, or $474,000, are delinquent out of a portfolio of $181.8 million; all but one, or $5.0 million, of our middle market loans are current out of a portfolio of $331.0 million; and none of our 87 CRE loans, totaling $1.6 billion, are delinquent.

(Emphasis added.)

245.    In addition, Resource Capital disclosed its allowance for loan loss had increased to $46.319 million as of June 30, 2015, compared to $7.385 million as of March 31, 2015 and $4.613 million as of December 31, 2014.

## F.    Defendants Acted with Scienter

246.    Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants. Further, the Individual Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law. Because of their key roles in the Company, the Individual Defendants caused Resource Capital to engage in the aforementioned course of conduct and to perpetuate the material misrepresentations and omissions it made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the Exchange Act.

112

### (1)     Defendants Ignored Red Flags

247.    As revealed at the end of the Class Period, the Mezzanine Loan was secured by assets exclusively located within Puerto Rico.  The concentration of collateral in Puerto Rico subjected the Mezzanine Loan and, in turn, the Company's shareholders, to a severe risk of loss in light of Puerto Rico's ongoing economic decline.  Defendants either intentionally refused or recklessly failed to acknowledge that the Mezzanine Loan subjected shareholders to this risk of loss.

248.    Defendants repeated stated repeatedly, indeed in almost every quarterly and annual report filed by Resource Capital during the Class Period, that loans held for investment are evaluated for impairment at least quarterly.  By examining a variety of factors, Defendants evaluated credit risk among their portfolios. Each quarterly and annual report filed by the Company during the Class Period included the following explanation of Resource Capital's process for evaluating credit risk of commercial real estate loans:

> The Company uses a risk grading matrix to assign grades to commercial real estate loans.  Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating.  The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

249.    Notably, with regard to credit risk, the Company stated that "[l]oans are graded at inception and updates to assigned grades are made continually as new information is received." In addition, this disclosure explained the specific factors other than performance of the underlying collateral, that the Company looked for to evaluate the credit risk of commercial real

113

estate loans, including "collectability of interest, structural credit enhancements, [and] market trends[.]"

250.    Further to the point, Defendants Cohen and Bloom in particular repeated again and again that "credit quality" was the Company's utmost concern.  Throughout the entire Class Period, Defendants emphasized their focus on "credit quality"—for example, during the earnings call on October 31, 2012, Defendant Bloom stated:

> While we see many lending opportunities, we continue to be keenly focused and aware of credit, value, and deal structure. And although we are lending on lightly transitional properties, we're only doing loans with day-one cash flow coverage and meaningful sponsor equity.

and during the earnings call on May 6, 2015, Defendant Bloom stated:

> As I have said in previous calls, while we have recognized peak production levels in our origination efforts and are again projecting increased volume for 2015, our primary focus remains as always on credit. Our core lending philosophy still places the ultimate premium on asset quality, location and business plan – with significant [ph] official sponsor experience and financial strength.
>
> Through the application of strict valuation, cash flow metrics and conservative growth and exit assumptions, RSO continues to build a strong portfolio that has ready access to term financing through our financing facilities with our commercial banking partners as well as in the CRE CLO where RSO's deals have been met with broad acceptance.

251.    Despite these specific factors that the Company identified as affecting credit risk and loan impairment in its at-least-quarterly reviews of the Company's commercial real estate loans, Defendants ignored the Puerto Rican economic crisis and its effects on the mezzanine loan position. Specifically, while the following (among other events identified above) occurred, the Company at times rated the mezzanine loan position involving Puerto Rican assets at its highest credit rating and failed to take an impairment charge on the loan:

- The Puerto Rican economy has been mired in a recession since around 2006;

- Puerto Rico's economy declined against the mainland economy's rise beginning in 2011;

- Moody's downgraded the asset pools in the 2007-WHALE8 Trust related to the mezzanine loan position to very high credit risk in August 2012;

- The Company stopped receiving interest income on the loan in September 2012;

- The Standard & Poor's Puerto Rico Municipal Bond index plunged 19% between May 1, 2013 and September 17, 2013;

- Mutual funds with high levels of investment in Puerto Rican bonds were reportedly investigated by the Commonwealth of Massachusetts in October 2013;

- All three major credit ratings agencies downgraded Puerto Rico's bonds to junk in February 2014;

- Fitch rated the asset pools in the 2007-WHALE8 Trust related to the mezzanine loan position as exceptionally high levels of credit risk in May 2014; and

- As of April 2015, the only properties securing the Mezzanine Loan were assets located within Puerto Rico.

252. Defendants' stated internal policies concerning credit risk evaluation, on the one hand, and their apparent refusal or failure to disclose the credit risk inherent in the Mezzanine Loan to investors, on the other hand, strongly suggests that they acted with scienter.

### (2) Defendants Attempted to Hide their Wrongdoing

253. In the August 8, 2014 10-Q, Defendants altered longstanding disclosure language that was materially misleading. Specifically, until the August 8, 2014 10-Q, in the course of disclosing the purported credit quality of Resource Capital's commercial real estate loan portfolio, the same affirmative language was used: "All of our commercial real estate loans were performing as of . . . ." However, as the end of the Class Period neared, the Company suddenly changed the language used in this disclosure from its previous disclosures—using the word "current" rather than "performing"—when describing its commercial real estate loan portfolio.

254. In the August 8, 2014 10-Q, November 10, 2014 10-Q, and May 11, 2015 10-Q, the Company affirmatively stated, "All of our commercial real estate loans were current as of . . . ."

115

255.    Then, on August 7, 2015, Defendants again changed the language used in connection with this disclosure—the August 7, 2015 10-Q stated that "[t]he Company had no *delinquent* commercial real estate loans[,]" a negative phrasing, rather than affirmatively stating that all of the Company's loans were "current" or "performing," like all of Resource Capital's disclosures dating back to the beginning of the Class Period.

256.    Specifically, "performing" implies an active meeting of the borrower's obligations. Indeed, Black's Law Dictionary defines "performance" as "[t]he successful completion of a contractual duty, usually resulting in the performer's release from any past or future liability[.]" As the borrowers under the mezzanine loan involving the Puerto Rican assets stopped paying interest to the Company under the loan in September 2012 and interest continued to accrue, the loan could not be said to have been performing.

257.    Likewise, according to Black's Law Dictionary, "current" implies that the borrower under the mezzanine loan had some obligation to pay interest and was meeting that obligation.

258.    However, when the Company finally revealed the truth—that the mezzanine loan involving Puerto Rican assets stopped paying interest in September 2012—the Company used the negative phrasing "[t]he Company had no delinquent commercial real estate loans[.]" Use of the negative phrase, stating that a loan is not delinquent, means that the borrower has not failed to meet an obligation.

259.    Accordingly, by switching to the negative phrase "had no delinquent loans" only at the time of the corrective disclosures from the affirmative prior disclosures, a strong inference is raised that Defendants recognized the misleading nature of the words "performing" and "current" when used in connection with the Company's mezzanine loan portfolio and acted with

116

the intent to mislead or were reckless with respect to the risk of misleading the purchasers of Resource Capital stock.

**(3)      Defendants Were Aware of the Mezzanine Loan's Bad Performance**

260.      As Defendants acknowledged in the August 5 conference call, they recognized around 2007 that investing in mezzanine loans behind a senior credit structure involves a fatal flaw: the mezzanine lender gets paid last with the most illiquid properties as the underlying portfolio is liquidated. Compounding this fact is the Company's recognition that geographic concentration may have a material negative effect on the performance of the Company's investment portfolio. Indeed, according to Defendants, investing in commercial real estate mezzanine loans was "subject to the risks inherent in the real estate securing or underlying those investments[.]" Specifically, "[t]he ability of a borrower to repay a loan secured by or dependent upon an income-producing property typically depends primarily upon the successful operation of the property . . . . If the net operating income of the property is reduced, the borrower's ability to repay the loan may be impaired." In turn, Defendants warned that the "property location and condition; . . . changes in national, regional or local economic conditions and/or the conditions of specific industry segments in which [the Company's] lessees may operate; declines in regional or local real estate values; . . . [and] the availability of debt or equity financing" can affect the net operating income of the underlying properties and hence the performance of Resource Capital's mezzanine loan portfolio.

261.      Defendants caused Resource Capital to cease participating in the mezzanine loan market after taking its position in the Puerto Rico mezzanine loan. During the August 5 earnings call, Defendant Cohen made clear the Company "stopped investing in this type of loan in 2007. . . . On such a highly leveraged transaction even small changes in value can have a large impact on the subordinated tranches . . . ." Bloom then explained that times changed after Resource

117

Capital's initial acquisition of the mezzanine loan position: "Markets were extremely liquid . . ., that said *we were always cognizant of the fact that multi-tranche debt transactions involved other lenders which results in a lack of unilateral control should a problem arise*." (Emphasis added.) During the discussion with analyst DeLaney during the call, Defendants acknowledged that holding a mezzanine loan position in the complicated structure left the Company holding "the weaker loans in the pool" and "that was the weakness in that structure and one reason why [Defendants] ceased doing that business."

262.   They did just this with respect to the Mezzanine Loan, yet failed to properly disclose its risks to investors.   According to Defendants, Resource Capital's loans would be impaired in two scenarios: (a) "based on current information an events, management believes it is probable that the Company will be unable to collect all amounts due according to the contractual terms of the loan agreement" or (b) "the loan is deemed to be a troubled-debt restructuring ('TDR') where a concession has been given to a borrower in financial difficulty." Ultimately, Defendants acknowledged that the Puerto Rico mezzanine loan was a TDR, the value of which was disclosed sporadically during the Class Period.

263.   Despite the fact that the Company stopped receiving income from the Puerto Rico mezzanine loan in September 2012, and on this basis it was a TDR, on six occasions throughout the Class Period, or more specifically, in six of the eight quarterly and annual reports from August 2013 to the end of the Class Period, the Defendants stated that the Company's mezzanine loan portfolio did not contain any TDR.

264.   Not until November 10, 2014, did Defendants begin to disclose that the Mezzanine Loan was a TDR.  Even still, however, the Company represented that "there were no troubled-debt restructurings that subsequently defaulted."

265.    Defendants belated, surreptitious disclosure of the Mezzanine Loan as a TDR (albeit one that had not "subsequently defaulted") establishes that they were aware of the Mezzanine Loan's risks.  Notwithstanding, they failed to properly alert investors of the imminent risk of default.  Defendants' conduct in this regard strongly supports an inference of scienter.

### (4)    David E. Bloom's Stock Sales Supports the Inference of Scienter

266.    On March 13, 2014, Bloom, the Company's Senior Vice President for Commercial Real Estate, filed a Form 4 with the SEC disclosing the sale of stock. The Form 4 disclosed that on March 11, 2014 Bloom sold 29,000 shares at prices ranging from $5.78 to $5.80 per share. The Form 4 further disclosed that on March 12, 2014 Bloom sold an additional 8,165 shares at prices ranging from $5.76 to $5.79 per share.  These sales took place at prices that were nearly double the $2.97 per share to which Resource Capital stock fell following the corrective disclosures.  Accordingly, by selling when he did, Bloom effectively inflated his proceeds by more than 48%.

267.    Bloom's stock sales were irregular and atypical in terms of timing and size and, therefore, indicative of scienter.  First, these sales followed by mere weeks the three major credit rating agencies' downgrade of Puerto Rican debt and only one week the filing of the materially misleading 2013 10-K.  Second, prior to Bloom's sale on March 11, 2014, he had not sold a single share of Resource Capital stock in three years and has not sold a single share since.  Third, in the aggregate, the transactions represented a sale of 20% of Bloom's vested shares, or more than 11% of his total holdings in the Company.

268.    As the Company's Senior Vice President for Real Estate Investments and a key spokesperson for the Company on matters relating to the value of its commercial real estate loan portfolio, Bloom was in a position to understand the effects of the Puerto Rican economic crisis on Resource Capital's mezzanine loans backed by Puerto Rican hotels, perhaps better than

119

anyone else at the Company.  Indeed, as Senior Vice President for Real Estate Investments, Bloom was responsible for the Company's quarterly evaluations for loan loss impairments and most often affirmed his commitment to "credit quality" to investors.

269.   Bloom's access to information pertaining to the mezzanine loan at issue along with his material insider sale of stock is highly indicative of scienter.  Given Bloom's senior position within Resource Capital and responsibility for reporting information to senior officers and the public, Bloom's scienter is imputed to Resource Capital.

**G.      Defendants' Fraud Resulted in Losses to Resource Capital Investors**

270.   During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Resource Capital's common stock which operated as a fraud or deceit on Class Period purchasers of Resource Capital common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the trading price of Resource Capital's common stock fell precipitously, as the prior artificial inflation came out of the price over time.

271.   Specifically, Defendants omitted to disclose a mezzanine loan position involving real estate assets in Puerto Rico with a principal value of $38.1 million and accrued interest of $3.0 million. When Defendants finally reserved the amounts as an allowance for loan loss, $41.1 million was reversed against interest income. This allowance wiped out the Company's quarterly profit, resulting in a net loss of $31.0 million. As a result of these corrective disclosures, the trading price of Resource Capital's common stock plunged from its closing price of $3.48 on August 4, 2015, to close at $3.05 on August 5, 2015, a single-day loss of more than 12%, on extremely heavy trading.   Accordingly, the announcement wiped out approximately $54.6 million of Resource Capital's market capitalization.

272. After the earnings call on August 5, 2015, Resource Capital stock fell from $3.05 per share on August 5, 2015 to close at $2.97 per share on August 6, 2015. In total, the trading price of the Company's stock had fallen $0.51 per share, or 15%, from its closing price of $3.48 on August 4, 2015, prior to the Company's disclosures regarding the Puerto Rico mezzanine loan position.

273. As a result of their purchases of Resource Capital's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

274. At all relevant times, the market for Resource Capital's common stock was an efficient market for the following reasons, among others:

a) Resource Capital common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) During the Class Period, on average, approximately 1 million shares of Resource Capital's common stock were traded on a weekly basis. Approximately 1% of Resource Capital's outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

c) Resource Capital filed periodic public reports with the SEC and the NYSE; and

d) Resource Capital regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

275. As a result of the foregoing, the market for Resource Capital's common stock promptly digested current information regarding Resource Capital from all publicly available

121

sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Resource Capital common stock during the Class Period suffered similar injury through their purchase of Resource Capital common stock at artificially inflated prices and a presumption of reliance applies.

## PRESUMPTION OF RELIANCE: *AFFILIATED UTE*

276.    Neither Plaintiff nor the Class need prove reliance—either individually or as a class—because under the circumstances of this case, which involve a failure to disclose and disclosure and internal control deficiencies, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.  Here, the facts withheld were material because a reasonable investor would have considered Resource Capital's exposure to the Puerto Rican economy to be materially important in evaluating the investment potential of the Company.

## THE SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

277.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to

any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Resource Capital who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

278.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Resource Capital common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

279.    The members of the Class are so numerous that joinder of all members is impracticable, since Resource Capital has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE.  As of August 5, 2015, Resource Capital had more than 134 million shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

280.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)    whether the Exchange Act was violated by Defendants;

123

(b)    whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)    whether the price of Resource Capital common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages as a result of the decline in value of Resource Capital's common stock when the truth was revealed, and if so, what is the appropriate measure of damages.

281.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

282.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

283.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of Section 10(b) of**
**the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

284.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

285.    This Count is asserted by Plaintiff on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

286.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Resource Capital's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Resource Capital's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

287.    Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Resource Capital's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

125

288. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

289. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

290. As a result of Defendants' fraudulent activity, the market price of Resource Capital common stock was artificially inflated during the Class Period.

291. In ignorance of the true financial condition of Resource Capital, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Resource Capital containing the misleading information, purchased or otherwise acquired Resource Capital's common stock at artificially inflated prices during the Class Period.

292. Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Resource Capital's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Resource Capital's common stock in reliance on the integrity of the market price of those shares,

126

and Defendants manipulated the trading price of Resource Capital's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Resource Capital.

293.    Throughout the Class Period, Defendants were aware of material non-public information concerning Resource Capital's fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

294.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Resource Capital common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

295.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

296.    During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

127

297.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

298.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Resource Capital's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Resource Capital's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

299.    The Individual Defendants acted as controlling persons of Resource Capital within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Resource Capital to

128

engage in the wrongful conduct complained of herein. The Individual Defendants controlled Resource Capital and all of its employees. As alleged above, Resource Capital is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

300.    As a direct and proximate result of the wrongful conduct of Resource Capital and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(B)    Awarding Plaintiff and the members of the Class damages, including interest;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 12, 2016                    **LEVI & KORSINSKY LLP**


  /s/ Adam M. Apton
Nicholas I. Porritt
Adam M. Apton
Michael B. Ershowsky (to be admitted)
LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor
New York, New York 10004
Telephone:  (212) 363-7500
Facsimile:  (212) 363-7171

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

4813-7712-7726, v. 2

130