**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAREN LEVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>v.<br><br>RESOURCE CAPITAL CORP., JONATHAN Z. COHEN, DAVID J. BRYANT, ELDRON C. BLACKWELL, and DAVID E. BLOOM,<br><br>                          Defendants. | Docket No.: 1:15-cv-07081-LLS |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES,**
**AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS COMMON TO THE CLASS ................................. 2

III.  THE PROPOSED CLASS DEFINITION ........................................................ 3

IV.   THE PROPOSED CLASS REPRESENTATIVES ........................................... 4

V.    THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS
      CERTIFICATION UNDER RULE 23 ............................................................... 5

      A.    The Proposed Class Satisfies the Standards for Class Certification under Rule
            23(a). ........................................................................................................ 6

            1.   The class is so numerous that joinder is impracticable. .................... 6

            2.   Common question of law and fact exist. ........................................... 7

            3.   The proposed Class Representatives' claims are typical of those of the Class. 8

            4.   The proposed Class Representatives will fairly and adequately protect the
                 interests of the Class. ....................................................................... 9

      B.    The Proposed Class Satisfies the Standard for Class Certification under Rule
            23(b). ....................................................................................................... 11

            1.   The Class's claims are based on common factual and legal issues. .............. 11

            2.   A class action is superior to other available methods for the fair and efficient
                 adjudication of the controversy. ..................................................... 20

      C.    The Court Should Appoint Plaintiffs' Choice of Counsel as Class Counsel under
            Rule 23(g). .............................................................................................. 21

VI.   CONCLUSION ............................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972) ................................................................................................ 18

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ...................................................................................... 9, 10, 11

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds,*
    568 U.S. 455, 133 S. Ct. 1184 (2013) .................................................................. 5

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
    222 F.3d 52 (2d Cir. 2000) ............................................................................ 9, 10

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) .............................................................................. 2, 12, 13, 14

*Billhofer v. Flamel Tech., S.A.,*
    281 F.R.D. 150 (S.D.N.Y. 2012) ........................................................................ 14

*Blackie v. Barrack,*
    524 F.2d 891 (1975) ............................................................................................ 12

*In re Blech Sec. Litig.,*
    187 F.R.D. 97 (S.D.N.Y. 1999) ............................................................................ 6

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) .................................................................. 13, 14

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
    310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................. 5, 14, 20

*Cent. States Southeast & Southwest Areas Health & Welfare Fund v. MerckMedco Managed Care, L.L.C.,*
    504 F.3d 229 (2d Cir. 2007) ................................................................................. 6

*Comcast Corp. v. Behrend,*
    __ U.S. __, 133 S. Ct. 1426 (2013) .................................................................... 19

*Consol. Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 1995) ............................................................................... 6, 7

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.,*
    502 F.3d 91 (2d Cir. 2007) ................................................................................. 20

*Dietrich v. Bauer,*
    192 F.R.D. 119 (S.D.N.Y. 2000) .......................................................................... 7

*Fogarazzo v. Lehman Bros.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ................................................................................ 6

*Francisco v. Abengoa, S.A.*,
    No. 15 Civ. 6279 (ER), 2016 U.S. Dist. LEXIS 68145 (S.D.N.Y. May 24, 2016) ................. 11

*In re Groupon, Inc. Secs. Litig.*,
    No. 12 CV 2450, 2014 U.S. Dist. LEXIS 137382 (N.D. Ill. Sep. 23, 2014) ........................... 13

*In re Groupon Inc. Sec. Litig.*,
    No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334 (N.D. Ill. Mar. 5, 2015) ................................. 13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    __ U.S. __, 134 S. Ct. 2398 (2014) ................................................................ 12, 13

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ...................................................................................... 6

*In re JPMorgan Chase & Co. Sec. Litig.*,
    No. 12 Civ. 03852 (GBD), 2015 U.S. Dist. LEXIS 132181 (S.D.N.Y. Sept. 29, 2015) ...... 6, 19

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ............................................................................. 22

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ...................................................................... 13, 14

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ......................................................................... 8

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
    No. 11 Civ. 7866 (VM), 2015 U.S. Dist. LEXIS 95221 (S.D.N.Y. July 20, 2015) ................. 7

*In re MF Global Holdings Ltd. Inv. Litig.*,
    310 F.R.D. 230 (S.D.N.Y. 2015) ............................................................................... 8

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ................................................................................ 1

*In re Ocean Power Techs., Inc.*,
    No. 3:14-CV-3799, 2016 U.S. Dist. LEXIS 158222 (D.N.J. Nov. 15, 2016) ......................... 11

*Open Hous. Ctr. v. Samson Mgmt. Corp.*,
    152 F.R.D. 472 (S.D.N.Y. 1993) ............................................................................... 6

*Padilla v. Maersk Line, Ltd.*,
    271 F.R.D. 444 (S.D.N.Y. 2010) ............................................................................. 12

*In re Parmalat Sec. Litig.*,
    No. 04 MD 1653 (LAK), 2008 U.S. Dist. LEXIS 64296 (S.D.N.Y. Aug. 21, 2008) ................. 6

*Pennsylvania Ave. Funds v. Inyx, Inc.*,
  No. 08-cv-6857, 2011 U.S. Dist. LEXIS 72999 (S.D.N.Y. July 5, 2011) ........................... 7, 10

*Pub. Emples. Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
  277 F.R.D. 97 (S.D.N.Y. 2011) .......................................................................... 1, 7

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) ...................................................................... 12, 19, 20

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ................................................................................. 8

*In re Sanofi-Aventis Sec. Litig.*,
  293 F.R.D. 449 (S.D.N.Y. 2013) ........................................................................... 22

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) ............................................................................... 13

*In re SCOR Holding (Switzerland) AG Litig.*,
  537 F. Supp. 2d 556 (S.D.N.Y. 2008) .................................................................... 21

*Seijas v. Republic of Arg.*,
  606 F.3d 53 (2d Cir. 2010) ................................................................................. 12

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ........................................................................... 19

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015) ................................................................................. 19

*Sykes v. Mel S. Harris and Associates LLC*,
  780 F.3d 70 (2d Cir. 2015) ................................................................................. 11

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*,
  No. 05 Civ. 1898 (SAS), 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006)................. 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .......................................................................................... 21

*UFCW Local 1776 v. Eli Lilly and Co.*,
  620 F.3d 121 (2d Cir. 2010) ................................................................................ 11

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) ............................................................................... 13

*In re Vivendi Universal, S.A.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ........................................................................ 8, 9, 21

*Wallace v. IntraLinks*,
  302 F.R.D. 310 (S.D.N.Y. 2014) ........................................................................... 20

*In re WorldCom, Inc. Sec.* Litig.,
   219 F.R.D. 267 (S.D.N.Y. 2003).................................................................................... 10, 21

**Other Authorities**

1 Herbert B. Newberg, Newberg on Class Actions §3.05 (2d ed. 1985)....................................... 6

**Rules**

Fed. R. Civ. P. 23(a) ........................................................................................... 1, 6, 7, 8

Fed. R. Civ. P. 23(b) ........................................................................................... 2, 11, 20

Fed. R. Civ. P. 23(g) ........................................................................................... 21, 22

Lead Plaintiff Douglas Drees ("Drees") and Plaintiff Allen Altman, Individually and as Trustee for the Allen Altman & Catherine Altman Living Trust (the "Altman Trust") (collectively, "Plaintiffs"), respectfully submit this memorandum of law in support of Plaintiffs' Motion for Class Certification and request that, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), the Court certify this case as a class action, appoint Plaintiffs as Class Representatives, and appoint Levi & Korsinsky LLP as Class Counsel.

## I.    INTRODUCTION

As courts within this district routinely recognize, "'[c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws.'" *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009); *see also Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 101 (S.D.N.Y. 2011) ("As courts have repeatedly found, suits alleging violations of the securities laws . . . are especially amenable to class resolution."). This case is no exception to that widely held rule.

To the contrary, this securities case is about as appropriate and straightforward a candidate for class certification as this Court is likely to encounter. Plaintiffs easily satisfy the Rule 23(a) requirements—numerosity, commonality, typicality and adequacy—which are oftentimes hotly contested at the class certification stage, as Plaintiffs are members of the proposed Class consisting of thousands of injured investors dispersed throughout the country who were similarly injured by Defendants' false and misleading statements throughout the Class Period.

Nor is there any legitimate argument to be made that either the proposed Class Representatives or proposed Class Counsel is inadequate or atypical. The Class Representatives consist of committed, sophisticated individual investors whose purchases include the common and preferred stock at issue in this case. Further, in the case of Lead Plaintiff Douglas Drees, he has actively and zealously represented the interests of the Class to date by defeating a motion to dismiss against determined and experienced adversaries and participating in discovery. So too is Levi & Korsinsky, a successful and experienced securities class action law firm, committed to prosecuting this action vigorously, and in the best interest of the Class, including taking this action to trial.

1

Plaintiffs also easily satisfy the Rule 23(b) requirements for class certification, which state that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate this dispute. Plaintiffs allege claims under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. The prima facie elements of these claims depend on class-wide issues, such as whether or not Defendants made materially misleading public statements and acted with scienter. Furthermore, with regard to the element of reliance, Plaintiffs rely on the "fraud-on-the-market" presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Plaintiffs have retained Professor Steven P. Feinstein, Ph.D., CFA, to show that the "fraud-on-the-market" presumption applies in the matter at hand and, therefore, certification of the proposed class is appropriate. Professor Feinstein, through empirical evidence, confirms in his report filed herewith that the "fraud-on-the-market" presumption applies in this matter and that certification of the class is warranted. Given the common issues to all class members, a class action is the best manner to proceed in this litigation.

Plaintiffs satisfy the requirements of Rule 23(a) and (b) and, therefore, certification of the proposed Class is appropriate.

## II.    STATEMENT OF FACTS COMMON TO THE CLASS

Resource Capital is a real estate finance company that focuses primarily on commercial real estate-related investments. ¶2.[1] At issue in this case is Resource Capital's position in a toxic mezzanine loan (the "Mezzanine Loan"). ¶3. The Mezzanine Loan originated in 2007 from a commercial mortgage trust sponsored by Wachovia Bank (the "2007-WHALE 8 Trust"). ¶¶3, 47. The Mezzanine Loan was collateralized by $1.3 billion of commercial mortgages for luxury hotel properties (the "LXR Hospitality Pool Loan"). ¶¶47, 241. Three of the twelve properties comprising the LXR Hospitality Pool Loan were located in Puerto Rico. ¶47. Collectively, these three Puerto Rican properties had an initial mortgage loan amount of over $586 million (approximately 45% of the Mezzanine Loan's collateral).

---

[1] Citations to "¶__" and "¶¶__" refer to paragraphs in Plaintiffs' Second Amended Complaint for Violation of Federal Securities Laws ("Complaint") (Dkt. No. 55).

Despite Puerto Rico's worsening economic situation, Defendants never told investors about Resource Capital's exposure to Puerto Rico through the Mezzanine Loan. ¶6. Instead, Resource Capital continually represented that its geographic holdings in commercial real estate loans related only to other regions within the United States. *E.g.* ¶¶74, 90, 105, 123, 140, 142, 175. Moreover, even though the Mezzanine Loan stopped paying interest and qualified as a "troubled-debt restructuring" early in the class period, Defendants represented to investors that the Mezzanine Loan was "performing" and "current." *E.g.* ¶¶56, 70, 86, 100, 118, 136. Resource Capital even told investors at various times that the Mezzanine Loan was deserving of its safest risk rating—"Rating 1". *E.g.* ¶¶93, 126, 145.

Like the defendants in any one of a number of subprime mortgage and collateralized debt obligation lawsuits that followed the meltdown of the financial industry in 2008 and 2009, Defendants concealed the risks of their toxic assets from investors—in this case, the Mezzanine Loan secured by collateral in Puerto Rico. Defendants knew of these risks and were in the best positions to recognize the threats surrounding them, but said nothing. Instead, Defendants waited as long as possible before revealing that the Mezzanine Loan was unrecoverable and that it would be taking an impairment of over $40 million. ¶¶238-42. The impairment, which Resource Capital finally announced on August 5, 2015 almost three years after the start of the class period, had the effect of reducing Resource Capital's per-share book value by $0.31 and stockholder equity by almost $60 million. ¶242. Resource Capital's common stock price declined by $0.51 per share; the Series B and C preferred stock prices declined by $1.51 per share and $1.75 per share. ¶272.

## III.    THE PROPOSED CLASS DEFINITION

The proposed class definition, as defined in the Complaint, includes "all persons who purchased or otherwise acquired Resource Capital's common stock, Series B preferred stock, and Series C preferred stock during the Class Period." ¶279. Excluded from the Class are Defendants and their related entities. *Id*. "Defendants" refers to Resource Capital Corp. ("Resource Capital"), Jonathan Z. Cohen, David J. Bryant, Eldron C. Blackwell, and David E. Bloom. ¶¶22, 23.

## IV.     THE PROPOSED CLASS REPRESENTATIVES

Lead Plaintiff Douglas Drees is a proposed Class Representative. Mr. Drees is uniquely suited to serve as a Class Representative. He is an attorney with experience in real estate and accounting. Declaration of Douglas Drees, ¶3 (filed herewith). Mr. Drees currently is employed by EFCO Corp. as its Vice President and General Counsel. *Id*. EFCO Corp. is a private company within the construction industry located in Des Moines, Iowa. *Id*. Mr. Drees formerly worked for KPMG as a Senior Tax Analyst. *Id*. He has been a member of the Iowa State Bar since 1996. *Id*. Mr. Drees, thus far, has demonstrated an impressive understanding of the complex facts of this case, including the structure of the WHALE-8 Trust, Resource Capital's interests in WHALE-8 Trust's mezzanine layers, and the risk to Resource Capital's position arising from the underlying collateral. *Id*. at ¶4.

During the course of the litigation thus far, Mr. Drees has already expended substantial time and effort in informing himself about this case, working with counsel to vigorously prosecute this action on behalf of the Class he represents, and participating in discovery. His involvement in the litigation has included:

- Regular and routine correspondence with Lead Counsel, Levi & Korsinsky;
- Assisting Lead Counsel in responding to Defendants' discovery demands, including searching for and providing numerous documents;
- Assisting Lead Counsel in developing a strategy for discovery; and
- Collaborating with Lead Counsel in connection with developing liability arguments for mediation.

Declaration of Douglas Drees at ¶¶6, 7.

In addition to being an adequate Class Representative, Mr. Drees is also typical of the other members of the Class whom he seeks to represent. Mr. Drees purchased shares of Resource Capital's common stock on the NYSE during regular market hours and held those shares through the end of the class period to his detriment. *Id*. at ¶5.

If confirmed as Class Representative, Mr. Drees will continue to supervise the litigation and monitor Lead Counsel. He will also continue to provide fair and adequate representation to the members of the proposed Class and work with Lead Counsel to obtain the largest recovery possible. *Id*. at ¶8; *see also* Douglas Drees Certification (Dkt. No. 15-1).

Allen Altman, Individually and as Trustee of the Altman Trust, is the second proposed Class Representative. Mr. Altman purchased shares of Resource Capital's Series B and C preferred stock during the class period. *See* Declaration of Allen Altman, ¶6 (filed herewith); *see also* Allen Altman Certification (Dkt. No. 55-1). Mr. Altman is typical and adequate of all other investors that purchased Resource Capital's Series B and C preferred stock, as it purchased shares of common and preferred stock on the NYSE during normal market hours. *See id*. Mr. Altman is a highly educated individual investor who, individually and on behalf of the Altman Trust, is willing to serve in a representative capacity for the benefit of the Class. *Id*. at ¶¶4-5. If confirmed as a Class Representative, Mr. Altman will be committed to maximizing the recovery for the Class. *Id*. at ¶¶7-8.

## V. THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23

"To be certified, a putative class must demonstrate that it satisfies all four of the requirements of Rule 23(a) and one of the categories of Rule 23(b) of the Federal Rules of Civil Procedure." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 73 (S.D.N.Y. 2015). In determining whether a class should be certified, the analysis should be "'rigorous;'" however, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 133 S. Ct. 1184, 1194-95 (2013); *see also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) (instructing district courts to "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met," but cautioning against "assess[ing] any aspect of the merits unrelated to a Rule 23 requirement"); *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852 (GBD), 2015 U.S. Dist. LEXIS 132181, at *9

5

(S.D.N.Y. Sept. 29, 2015) ("The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification."). Because all of the requirements of Rule 23 have been met here, the Court should certify the proposed Class.

### A.    The Proposed Class Satisfies the Standards for Class Certification under Rule 23(a).

#### 1.    The class is so numerous that joinder is impracticable.

The numerosity requirement mandates that the proposed Class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) (citing *Cent. States Southeast & Southwest Areas Health & Welfare Fund v. MerckMedco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007)). In the Second Circuit, the numerosity requirement is presumptively satisfied where there are 40 or more class members. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 Herbert B. Newberg, Newberg on Class Actions §3.05 (2d ed. 1985)); *see also In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 U.S. Dist. LEXIS 64296, at *14-*15 (S.D.N.Y. Aug. 21, 2008) ("Although plaintiffs need not provide a precise calculation of the size of the class, and courts are permitted to draw reasonable inferences from the available evidence, numerosity is presumed where the class consists of at least 40 members.") (citing *Consol. Rail Corp.*, 47 F.3d at 483). Moreover, in demonstrating that numerosity is satisfied, plaintiffs may rely on reasonable inferences drawn from available facts to estimate the size of the proposed class. *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999); *Open Hous. Ctr. v. Samson Mgmt. Corp.*, 152 F.R.D. 472, 475 (S.D.N.Y. 1993).

There are far more than 40 members in the proposed Class here. On average during the Class Period, Resource Capital had 125.6 million shares of common stock, 2.5 million shares of Series B preferred stock, and 4.8 million shares of Series C preferred stock issued and outstanding.

Feinstein Report, ¶¶88, 174.[2] Although Plaintiffs have not at this time ascertained the precise number of potential Class members, they believe that there are, at the least, thousands of geographically dispersed members of the proposed Class. The precise identity of the members can be readily identified from Resource Capital's books and records. Clearly, the proposed Class consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable. *See Consol. Rail Corp.*, 47 F.3d at 483. Thus, the numerosity requirement is satisfied.

### 2.  Common question of law and fact exist.

The Rule 23(a)(2) requirement that there are questions of law or fact common to the class is a "low hurdle" that is easily surmounted. *See In re MF Glob. Holdings Ltd. Inv. Litig.*, No. 11 Civ. 7866 (VM), 2015 U.S. Dist. LEXIS 95221, at *20 (S.D.N.Y. July 20, 2015); *see also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation"). "Common questions of law and fact include whether certain statements were false and misleading," whether they were material, and "whether [the] statements violated the federal securities laws." *Pennsylvania Ave. Funds v. Inyx, Inc.*, No. 08-cv-6857, 2011 U.S. Dist. LEXIS 72999, at *11-12 (S.D.N.Y. July 5, 2011); *see also Merrill Lynch & Co.*, 277 F.R.D. at 105 ("[C]ourts in this Circuit have held that the . . . commonality requirement is 'plainly satisfied [where] the alleged misrepresentations . . . relate to all the investors, [as the] existence and materiality of such misrepresentations obviously present important common issues.'") (citation omitted).

Plaintiffs' claims raise the common issue of whether Defendants' misrepresentations and omissions caused Plaintiffs' losses and whether Defendants acted with scienter. *Inyx*, 2011 U.S. Dist. LEXIS 72999, at *11-12 ("whether [material misstatements or omissions] were knowingly and recklessly issued, and ensuing causation issues" present common questions). In addition, the claims under Section 20(a) of the Exchange Act rest on the common legal and factual

---

[2] The Report on Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, dated June 2, 2017, is attached to the Declaration of Nicholas I. Porritt (the "Porritt Declaration"), filed herewith, as Exhibit A.

questions of whether there has been an underlying violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 and whether certain Defendants exercised "control" over the violators. *See*, *e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014) (questions regarding whether the defendant violated the federal securities laws and made material misrepresentations to the investing public satisfy the commonality requirement); *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (same). Accordingly, the proposed Class satisfies Rule 23(a)(2)'s commonality requirement.

### 3. The proposed Class Representatives' claims are typical of those of the Class.

Rule 23(a)(3) requires a showing that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). To establish typicality under Rule 23(a)(3), the party seeking certification must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). When the same unlawful conduct is alleged to have been directed at or similarly affected both the proposed class representatives and the putative class, "the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id*. at 936-37. The typicality requirement does not call for "'factual identity between the named plaintiffs and the class members,'" and, accordingly, "is 'not demanding'" to satisfy. *In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015). Thus, where, as here, plaintiffs in a securities class action "seek to develop facts relating to the alleged accounting irregularities and the dissemination of allegedly false or misleading statements. . . , [s]uch allegations are generally considered sufficient to satisfy the typicality requirement." *In re Vivendi Universal, S.A.*, 242 F.R.D. at 85.

The proposed Class Representatives assert claims typical of the absent Class members. The Complaint alleges that Defendants made material misrepresentations, and omitted material facts necessary to make the statements made therein not false or misleading, in their financial disclosures and public statements relating to Resource Capital's position in the Mezzanine Loan.

The Complaint further alleges that these misrepresentations and omissions violated the federal securities laws, and that Class members purchased their Resource Capital securities at artificially inflated prices as a result of Defendants' material misrepresentations and omissions. When Defendants' misconduct was revealed, the prices of Resource Capital's securities plummeted. As such, the proposed Class Representatives—each of whom purchased or otherwise acquired Resource Capital securities during the Class Period and then suffered a loss when the misconduct was disclosed—and all other Class members have been injured by the same alleged course of conduct. In fact, the proposed Class Representatives' claims are not merely similar to those of the other Class members, they are virtually identical and will be proven by common evidence. Accordingly, the typicality requirement of Rule 23(a)(3) is satisfied. *See, e.g.*, *In re Vivendi Universal, S.A.*, 242 F.R.D. at 85 ("[P]laintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements . . . Such allegations . . . generally . . . satisfy the typicality requirement.").

### 4.   The proposed Class Representatives will fairly and adequately protect the interests of the Class.

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met. The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citation omitted). "[T]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted).

Here, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem Products*, 521 U.S. at 597, and no actual or potential conflicts exist. Based upon their purchases of Resource Capital's common and preferred stock during the class period, Plaintiffs' interests are directly aligned with the interests of the Class, which was injured by the same materially untrue statements and omissions. *In re WorldCom, Inc. Sec.* Litig., 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (explaining that "named plaintiffs' interests are directly aligned with those of the absent class members; they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments"). When Plaintiffs prove their claims, they will also prove the Class's claims, satisfying the typicality requirement. *See*, *e.g.*, *Inyx*, 2011 U.S. Dist. LEXIS 72999, at *12-13.

Moreover, Plaintiffs have demonstrated their commitment to monitor and supervise the prosecution of this action on behalf of the Class. Plaintiffs have retained experienced counsel, receive regular status updates, participate in strategic decisions, and are actively engaged in discovery. *See* Declaration of Douglas Drees at ¶¶6, 7; Declaration of Allen Altman at ¶8. Plaintiffs are also sophisticated investors that understand the complexities of this case and are committed to monitoring counsel, supervising the litigation, and maximizing the Class's recovery in this action. *See* Declaration of Douglas Drees at ¶8; Declaration of Allen Altman at ¶7.

Finally, Plaintiffs have also engaged competent Lead Counsel that is "qualified, experienced and able to conduct the litigation," which further supports the conclusion that Plaintiffs will make adequate Class Representatives. *Baffa*, 222 F.3d at 60. Lead Counsel Levi & Korsinsky possesses extensive experience litigating securities class actions before this Court and other courts throughout the country, having successfully prosecuted numerous securities class actions on behalf of injured investors. *See* Levi & Korsinsky Firm Resume, attached to the Porritt Declaration as Exhibit B; *see also*, *e.g.*, *In re Ocean Power Techs., Inc.*, No. 3:14-CV-3799, 2016 U.S. Dist. LEXIS 158222, at *22 (D.N.J. Nov. 15, 2016) ("Lead Counsel, Levi & Korsinsky, is highly specialized in the field of securities class action litigation . . ."); *Francisco v. Abengoa, S.A.*, No. 15 Civ. 6279 (ER), 2016 U.S. Dist. LEXIS 68145, at *20 (S.D.N.Y. May 24, 2016)

("[Plaintiffs] have retained [Levi & Korsinsky], competent and experienced counsel with extensive experience in these types of securities class actions."). Here, Levi & Korsinsky has engaged in an extensive investigation into Resource Capital's and the other Defendants' conduct, successfully opposed Defendants' motion to dismiss, pursued discovery, and litigated vigorously against determined and experienced defense counsel. In short, Levi & Korsinsky is qualified to serve as Lead Counsel, and is experienced and able to prosecute this action.

**B.    The Proposed Class Satisfies the Standard for Class Certification under Rule 23(b).**

Having met the Rule 23(a) prerequisites, the present action also satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate this dispute. *See Amchem Prods.*, 521 U.S. at 615. The Class's claims easily satisfy this requirement.

**1.    The Class's claims are based on common factual and legal issues.**

"Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem Prods.*, 521 U.S. at 625. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (internal quotation marks omitted). For example, it is well-established that where liability can be proved class-wide, individualized proof of damages does not defeat predominance. *See, e.g., Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("Comcast did not rewrite the standards governing individualized damage considerations . . . [a]ll that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability'") (citations omitted); *see also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402, 405 (2d Cir. 2015) (holding that individualized damages determination alone cannot defeat predominance, citing *Seijas v. Republic of Arg.*, 606

11

F.3d 53, 58 (2d Cir. 2010), and vacating an order denying certification); *Blackie v. Barrack*, 524 F.2d 891, 905 (1975); *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 450 (S.D.N.Y. 2010).

a.   The Class can rely upon the Fraud-on-the-Market presumption.

Plaintiffs will prove, on a common basis, the elements of their Section 10(b) claims. Those claims rest on a core set of material misrepresentations and omissions concerning Resource Capital's public statements about its exposure to the Mezzanine Loan. Accordingly, the Section 10(b) claims turn predominantly, if not exclusively, on common, class-wide questions concerning whether Defendants' misstatements and omissions were misleading and material. No difference exists in this regard between the claims based on purchases of common stock and preferred stock.

The reliance element of Plaintiffs' Section 10(b) claim will also be established on a common basis under the "fraud-on-the-market" theory. As explained in *Basic Inc. v. Levinson*, *supra*:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Id*. at 989 (citation omitted, alterations in the original). The Court further explained that "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Id*. at 991 (quotations omitted). The Supreme Court recently reaffirmed that the ruling in *Basic* was based on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, __ U.S. __, 134 S. Ct. 2398, 2410 (2014) ("*Halliburton II*"). Accordingly, "[i]n a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones." *In re Groupon, Inc. Secs. Litig.*, No. 12 CV 2450, 2014 U.S. Dist. LEXIS 137382, at *7 (N.D. Ill. Sep. 23, 2014) (citing *Basic*, 485 U.S. at 247 (1988) and *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010)). The fraud-on-the-

market presumption does not require a perfectly efficient market. *In re Groupon Inc. Sec. Litig.*, No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334, at *37 (N.D. Ill. Mar. 5, 2015), citing *Halliburton II*, 134 S.Ct. at 2410 ("Debates about the precise degree to which stock prices accurately reflect public information are thus largely beside the point.") (emphasis in original).

In *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989), the court set forth certain factors to use to determine whether the market for stock is open and efficient: (1) whether there "existed an average weekly trading volume during the class period in excess of a certain number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a "strong presumption" (*Id*. at 1293); (2) whether "a significant number of securities analysts followed and reported on [the] company's stock during the class period"; (3) whether the company's stock "had numerous market makers"; (4) whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met"; and (5) whether "empirical facts show[ ] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id*. at 1284-87.[3]

The courts in *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005), and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001), likewise identified factors indicative of market efficiency. These factors are: (1) the company's market capitalization; (2) the stock's float; and (3) the typical bid-ask spread. *Krogman*, 202 F.R.D. at 477-78.

The so-called *Cammer* and *Unger/Krogman* factors, however, are not exclusive, and "should be used as an analytical tool rather than as a checklist" to establish market efficiency. *Billhofer v. Flamel Tech., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) (citing *Unger*, 401 F.3d at

---

[3] A market maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 515 (1st Cir. 2005); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-614 (C.D. Cal. 2009).

325). "At the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency. If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898 (SAS), 2006 U.S. Dist. LEXIS 52991, at *43 (S.D.N.Y. Aug. 1, 2006), *aff'd sub nom. Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008). Indeed, "[i]n most cases, evidence that a stock trades at high volumes on a large national market, such as the NYSE or NASDAQ, and is followed by a large number of analysts will be sufficient to satisfy the *Basic* presumption on class certification." *Barclays PLC*, 310 F.R.D. at 83. Here, as set forth in the Feinstein Report, the market was efficient as to Resource Capital's common and preferred stock and therefore Plaintiffs and the Class are entitled to the *Basic* presumption of reliance.

*Trading volume*. Under *Cammer*, turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security efficient; 1% would justify a substantial presumption. Feinstein Report at ¶58. During the class period, on average, 1 million shares of Resource Capital's common stock changed hands daily. *Id.* at ¶57. Resource Capital's preferred shares also exhibited significant turnover with an average of 20,862 Series B preferred shares and 29,412 Series C preferred shares traded daily. *Id.* at ¶158. Average weekly volume was also substantial—5 million shares of common stock (4% of outstanding shares), 104,307 shares of Series B preferred stock (4.1% of outstanding shares), and 147,061 shares of Series C preferred stock (3.08% of outstanding shares). *Id.* at ¶¶58, 159. These trading figures exceed the 2% "strong presumption" of market efficiency set out by *Cammer*. *Cammer*, 711 F. Supp. at 1293.

*Analyst coverage and other avenues of information dissemination*. During the Class Period, at least nine (9) well-known analyst firms reported on Resource Capital. These firms included Deutsche Bank, JMP Securities, and MLV & Co. Feinstein Report at ¶61. These three firms, in particular, discussed Resource Capital's common stock as well as preferred stock. *Id.* at ¶161. In addition to these traditional analyst firms, Resource Capital was the subject of numerous articles

14

written by less well-known financial analysts on investor websites, such as *SeekingAlpha.com*, which further supports the fact that information about Resource Capital was widespread through the market. *Id*. at ¶¶65, 66. Coverage by only *one or two* analysts has been found to strengthen the presumption of market efficiency. *Id*. at ¶64.

Further supporting a finding of market efficiency is the fact that a total of 416 major institutions owned Resource Capital securities during the class period. *Id*. at ¶¶68, 162. Institutional ownership is important because it is indicative of availability of information and, in turn, market efficiency. *Id*. at ¶¶67, 162.

Moreover, during the class period, Resource Capital was the subject of hundreds of news articles. *Id*. at ¶¶69, 163. The widespread coverage of Resource Capital's operations strongly supports a finding of market efficiency.

*Market makers and listing on the New York Stock Exchange*. During the class period, there were at least 144 market makers for Resource Capital's common stock, according to Bloomberg. *Id*. at ¶77. These market makers included well-known firms, such as Barclays, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS. *Id*. Additionally, Resource Capital's common and preferred stock was traded on the NYSE, which means that a "Designated Market Maker" existed for the Resource Capital securities at issue. *Id*. at ¶¶74, 77, 78, 167. These facts strongly support the conclusion that Resource Capital common and preferred stock traded in an efficient market.

*Ability to file a Form S-3*. S-3 registration eligibility indicates company characteristics associated with market efficiency, in particular characteristics of size, transparency, and the availability of relevant financial information. *Id*. at ¶81. Resource Capital possessed those particular characteristics throughout the class period and satisfied the conditions for S-3 registration eligibility. In fact, not only was Resource Capital eligible for S-3 registration, but it filed an S-3 Registration Statement on March 20, 2013. *Id*. at ¶¶82, 169.

*Market capitalization*. During the Class Period, the aggregate market value of Resource Capital's common stock averaged $692.7 million, which is at least 50% larger than the market capitalizations than all other publicly-traded companies in the United States. *Id*. at ¶85. Similarly,

the market capitalization of the Series B and Series C preferred stock was $58.9 million and $112.1 million, which is larger than the market capitalization of 30% of all other publicly-traded companies in the United States. *Id*. at ¶171. The market capitalizations of these securities further supports a finding of market efficiency. *Id*. at ¶¶86, 170.

*Float*. Resource Capital's common stock float averaged $673.0 million during the class period, larger than the total market capitalization of at least 50% of all other publicly-traded companies in the United States. *Id*. at ¶87. The float for Resource Capital's common stock comprised over 97% of its outstanding shares. *Id*. at ¶88. Similarly, the market capitalizations for Resource Capital's Series B and Series C stock was $58.9 million and $112.1 million, which comprised 100% of the outstanding Series B and Series C preferred stock. *Id*. at ¶171. Resource Capital's common and preferred stock float further supports a finding of market efficiency. *Id*. at ¶¶89, 175.

*Bid-ask spread*. The average bid-ask spread for Resource Capital's common stock over the course of the class period was 0.18%. *Id*. at ¶91. By comparison, the average month-end bid-ask spread over the course of the class period for all stocks in the Center for Research in Security Prices ("CRSP") database was 0.59%. *Id*. The average bid-ask spread for Resource Capital's Series B and Series C preferred stock over the course of the class period was 0.36% and 0.30%, respectively. *Id*. at ¶177. By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database was 0.59% (and 0.57% for the Series C Examination Period, as defined in the Feinstein Report). *Id*. Resource Capital's common and preferred stock bid-ask spreads were therefore substantially narrower than the mean level among all other CRSP stocks, further supporting a finding of market efficiency. *Id*. at ¶¶93, 179.

*Empirical evidence of market efficiency*. Dr. Feinstein conducted three sets of empirical tests of the efficiency of the market for Resource Capital common stock. *Id*. at ¶96. The first empirical test was an event study that investigated whether the market for Resource Capital common stock was efficient specifically with respect to the corrective disclosure that occurred on August 5, 2015, *i.e.*, Resource Capital's announcement that it was recognizing an impairment with

16

regard to the Mezzanine Loan. *Id*. at ¶¶97, 111-12. The results of the first empirical test showed that the corrective disclosure was strongly associated with a statistically significant residual return of Resource Capital's common stock. *Id*. at ¶¶126-27. In fact, according to Dr. Feinstein, the likelihood that the decline in Resource Capital's commons stock following August 5, 2015 was caused by general market events or random fluctuations (as opposed to the release of the corrective disclosure itself) was "virtually nil." *Id*. at ¶127. The results of the first empirical test "proves that [Resource Capital] common stock reacted to new information and its market was thus efficient, and particularly with respect to the information at issue." *Id*. at ¶128.

Dr. Feinstein conducted the same empirical test with regard to the Series B and Series C preferred stock, and concluded that the market for the preferred stock was likewise efficient. The residual returns following the August 5, 2015 corrective disclosure strongly supported the conclusion that the declines were not due to random fluctuations, but rather directly related to the disclosure concerning the impairment to the Mezzanine Loan. *Id*. at ¶¶188, 191. Accordingly, like the market for Resource Capital's common stock, the market for the Series B and C preferred stock was also efficient. *Id*. at ¶¶189, 192.

The second empirical test conducted by Dr. Feinstein focused on whether the price of Resource Capital's common stock reacted generally to company-specific news, *e.g.*, earnings announcements. *Id*. at ¶¶98, 131. Resource Capital announced earnings on twelve occasions during the class period; on five of the twelve occasions, Resource Capital's stock price reacted (*i.e.*, increased or decreased) by a statistically significant amount at the 95% confidence level (*i.e.*, the standard confidence threshold). *Id*. at ¶¶136, 138. This empirical analysis, which is referred to as a "Z-test," yielded a score of 4.93, which is significantly greater than the "critical z-statistic threshold of 1.65 for significance at the 95% confidence level." *Id*. at ¶139. This score is strong evidence that the change in Resource Capital's stock price was in direct response to the company-specific news, which proves that the market for Resource Capital's stock price was efficient. *Id*.

The third empirical test conducted by Dr. Feinstein compared the behavior of Resource Capital's common stock price on days with company-specific news (*i.e.*, earnings announcements)

17

with days that did not have company-specific news (*i.e.*, non-news days). *Id*. at ¶99. If the stock price exhibited more movement on days with company-specific news as opposed to non-news days, then the market for the stock is more likely efficient. *Id*. at ¶140. In the case of Resource Capital, Dr. Feinstein's evaluation (referred to as an "F-Test") showed that the price of Resource Capital's common stock moved more on news days than on other days, which supports "a cause-and-effect relationship between the release of new information and reactions in the [Resource Capital] common stock price, which therefore establishes that [Resource Capital] common stock traded in an efficient market during the Class Period." *Id*. at ¶145; *see also id*. at ¶¶147-48 (discussing alternate "Ansari-Bradley" test yielding same results).[4]

\*          \*          \*

Dr. Feinstein is a seasoned, experienced expert in the field of market efficiency. He holds a Ph.D. in Economics from Yale University, among other degrees. *Id*. at ¶7. He also teaches and publishes in the area of finance on a regular basis. *Id*. at ¶¶8-11. In his expert opinion, the markets for Resource Capital's common and preferred stock were efficient at all times during the class period. *Id*. at ¶¶17-22, 149-51, 194-96.

### b.   Reliance is also presumed under *Affiliated Ute*.

In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), the Supreme Court held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992). In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131. Here, reliance may be presumed under *Affiliated Ute* based on Defendants' omissions of material

---

[4] Dr. Feinstein did not conduct a "Z-test," "F-Test," or "Ansari-Bradley Test" analysis on the Series B and C preferred stock because preferred stock is inherently far less sensitive to company-specific or non-specific news, given the "equity buffer" provided by a company's common stock. *Id*. at ¶180. Accordingly, testing for market efficiency via these analyses would not have been appropriate.

18

information including, *inter alia*, Resource Capital's failure to disclose risks concerning potential losses arising from its exposure to the Mezzanine Loan.

c.   Damages are measurable on a class-wide basis.

Courts have consistently found that a plaintiff seeking class certification is not required to present a single means of calculating damages for every member of the proposed class. *See Roach*, 778 F.3d at 402 (Supreme Court's ruling in *Comcast Corp. v. Behrend*, __ U.S. __, 133 S. Ct. 1426 (2013), does not require "a finding that damages are capable of measurement on a classwide basis"). The Second Circuit has confirmed that "[a]ll that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015). Plaintiff have done just that.

While not necessary for certification, damages related to the Class's claims can be calculated using a common methodology. As described in Dr. Feinstein's report, utilizing his event study results, an inflation ribbon would be constructed by working backwards to the beginning of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. *See* Feinstein Report at ¶¶200-01. The damages per share will be the difference between inflation on the share purchase date and inflation on the share sale date. *Id*. Per share damages will be calculated using the same mathematical computation for all Class members. *Id*. Courts have consistently found that this approach satisfies *Comcast*. *Strougo v. Barclays PLC*, 312 F.R.D. 307, 327 (S.D.N.Y. 2016) ("Plaintiffs intend to use an event study and the constant dollar method to calculate damages. The proposed methodology fits their theory of the case and individualized damages issues will not predominate."); *In re JPMorgan Chase & Co. Secs. Litig.*, 2015 U.S. Dist. LEXIS 132181, at *24 (*Comcast* satisfied where "[p]laintiffs' expert proposes to calculate classwide, per-share damages through an event study analysis of the stock price inflation caused by Defendants' alleged misrepresentations or omissions"); *Barclays PLC*, 310 F.R.D. at 99 ("Plaintiffs' model survives the minimal scrutiny required under Comcast and Rule 23(b)(3) – their theory of liability matches their theory of damages and individualized damages issues will

19

not predominate."); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of Comcast . . . .").

Moreover, although the specific amount of damages may vary among Class members, it is well established that "'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *Roach*, 778 F.3d at 405 (collecting cases).

### 2. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation. Fed. R. Civ. P. 23(b)(3). "Together with predominance, the superiority requirement 'ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007). As aforementioned, courts have universally recognized the superiority of class actions in cases alleging securities fraud. The following factors are relevant to the superiority assessment:

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors weigh in favor of class certification in this case.

The members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation

in any context other than through their participation in a class action, given the expense and burden that such litigation would entail"); *In re Vivendi Universal, S.A.*, 242 F.R.D. at 92 (same). A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4, (2007) ("Nothing in the [PSLRA], we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses'—a matter crucial to the integrity of domestic capital markets.") (citations omitted).

Moreover, there are likely thousands of Class members (at the least). "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008). It would also "risk disparate results among those seeking redress." *Id*. Finally, there is no reason to expect any difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

**C.    The Court Should Appoint Plaintiffs' Choice of Counsel as Class Counsel under Rule 23(g).**

Consideration of Rule 23(g) supports appointing Levi & Korsinsky as Class Counsel. Under Rule 23(g)(4), the Court must appoint counsel who will fairly and adequately represent the Class, and to that end, considers:

> (i)     the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii)   counsel's knowledge of the applicable law; and
>
> (iv)    the resources that counsel will commit to representing the class . . . ."

Fed. R. Civ. P. 23(g)(1)(A); *see also In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 459 (S.D.N.Y. 2013) (noting the Rule 23(g) factors and finding Robbins Geller to have satisfied them). Because "the Private Securities Litigation Reform Act ('PSLRA') instructs that a lead plaintiff 'shall, subject to the approval of the court, select and retain counsel to represent the class,'" there is "'a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention.'" *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015). Accordingly, Plaintiffs' selection of Levi & Korsinsky as counsel favors Levi & Korsinsky with a presumption for its appointment as Class Counsel.

As discussed above in Section V.A.4., *supra*, Levi & Korsinsky has ably initiated, investigated and vigorously pursued the Class members' claims in this action and will continue to do so. It has proven its willingness to commit both substantial time and resources to representing the Class in this action and is aggressively pursuing discovery in this matter to uncover further evidence supporting the Class's claims. Moreover, Levi & Korsinsky has consistently demonstrated its competence to fairly and adequately represent the interests of the Class. Accordingly, Levi & Korsinsky meets the requirements of Rule 23(g) and should be appointed Class Counsel.

## VI.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing the Proposed Class Representatives as the Class Representatives; (3) appointing Levi & Korsinsky as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated:  June 2, 2017                    LEVI & KORSINSKY, LLP

                              By:     s/ Nicholas I. Porritt
                                    Nicholas I. Porritt
                                    Adam M. Apton
                                    Michael Ershowsky
                                    30 Broad Street, 24th Floor
                                    New York, New York 10004
                                    Tel: (212) 363-7500
                                    Fax: (212) 363-7171

                                    *Attorneys for Lead Plaintiff Douglas Drees,*
                                    *Plaintiff Allen Altman, and Lead Counsel for the Class*

4821-0012-3709, v. 1