## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAREN LEVIN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> RESOURCE CAPITAL CORP., JONATHAN Z. COHEN, DAVID J. BRYANT, ELDRON C. BLACKWELL, and DAVID E. BLOOM, <br><br> Defendants. | Docket No.: 1:15-cv-07081-LLS <br><br> Hon. Louis L. Stanton <br><br> **DECLARATION OF** <br> **NICHOLAS I. PORRITT** |

I, Nicholas I. Porritt, hereby declare as follows:

1.      I am a partner at the law firm of Levi & Korsinsky, LLP, counsel for Plaintiffs Douglas Drees and Allen Altman ("Plaintiffs") in the above-captioned matter. I submit this Declaration in support Plaintiffs' Motions for: (i) Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds; and (ii) an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards. Unless otherwise defined, capitalized terms in this declaration will have the same meaning as set forth in the Stipulation of Settlement, dated as of February 5, 2018 (the "Settlement" or the "Stipulation") (Dkt. No. 78).

2.      I have personal knowledge of the various matters set forth herein based on my day-to-day participation in the prosecution and settlement of this Action, and, if called as a witness, could and would testify completely thereto. Additionally, as the senior attorney directing the prosecution of this matter, I have a detailed understanding of the efforts of other attorneys who have worked on the Action. Additional matters are attested to, via separate declarations, by the

claims administrator in this case, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), as well as Plaintiffs Douglas Drees and Allen Altman.

## I.     INTRODUCTION

3.     Plaintiffs seek final approval of the proposed Settlement as well as an award of attorneys' fees, reimbursement of litigation expenses, and incentive awards. The Settlement creates a common fund of $9.5 million and represents an outstanding recovery for shareholders of Resource Capital Corp. ("Resource Capital"). These shareholders, who sustained financial damages as a result of Defendants' alleged fraudulent conduct, will receive a significant percentage of their market losses, which were estimated at $56 million. Indeed, the settlement fund created here is almost double the settlement fund typically created in securities class action cases of this size. To date, there has been just one objection to the proposed Settlement, which is a testament to its benefits. Plaintiffs respectfully request that the Settlement be approved in final.

4.     Plaintiffs also respectfully ask that the Court approve the requested fee, expense, and incentive awards. My firm, Levi & Korsinsky, commenced this action on September 9, 2015. From that point on, Levi & Korsinsky's attorneys ligated this case vigorously for approximately two and a half years before agreeing to the proposed Settlement on February 5, 2018. The firm invested more than 2,000 hours (worth over $1 million at market billing rates) and incurred almost $200,000 in out-of-pocket expenses that have yet to be reimbursed. In exchange, Levi & Korsinsky was able to defeat a difficult motion to dismiss, obtain discovery, take and defend party and expert depositions, secure class certification, and effectively resolve the matter through mediation. Levi & Korsinsky's efforts resulted in an extraordinary result for the Class and, as such, justify the standard award of 33% of the recovery, or $3,166,666.67.

5.     Levi & Korsinsky's success is also attributable, in part, to the assistance of their clients, Plaintiffs Douglas Drees and Allen Altman. Douglas Drees was the court-appointed Lead Plaintiff in this case. He faithfully upheld his responsibilities and, on frequent occasion, provided sophisticated analysis of Resource Capital's operations and finances in support of Plaintiffs' claims. He and Allen Altman also served as Class Representatives for the purposes of Class

Certification. They took their fiduciary obligations seriously and helped obtain the proposed Settlement, spending dozens of hours of their personal time in the process. In exchange for their efforts, Plaintiffs seek incentive awards in their favor of $10,000 and $5,000, respectively.

## II.   BACKGROUND

### A.   LITIGATION

6.      On August 4, 2015, Resource Capital announced that it was recording a $41.1 million allowance for loan losses on a mezzanine loan it held in one of its portfolios. The losses were, according to Resource Capital, caused by a decline in the value of the underlying collateral for the mezzanine loan which consisted of luxury hotels in or around San Juan, Puerto Rico. The market and Resource Capital investors were surprised and disappointed by this announcement and sold Resource Capital stock in large volume immediately following the announcement. Resource Capital's stock price declined $0.43 per share, or 12%.  Levi & Korsinsky began investigating the matter immediately, as Puerto Rico's economy had been in decline for some time and, therefore, the collateral at issue had likely declined in value long before the August 4 announcement. Due to the significance of this mezzanine loan to Resource Capital's portfolio and the regular reviews of its collateral that Resource Capital undertakes, it also appeared likely that Resource Capital management knew of the risks presented by this mezzanine loan. This suggested that Resource Capital had intentionally concealed its exposure to Puerto Rico from the market in violation of the federal securities laws.

7.      Our investigation accumulated enough facts to warrant the filing of a class action complaint. On September 9, 2015, my firm filed a class action complaint, styled *Levin v. Resource Capital Corp. et al*, 1:15-cv-07081-LLS, against Defendants asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5.

8.      As a class action lawsuit alleging claims under the Exchange Act, the matter was subject to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The PSLRA modified the Exchange Act in 1995 by, among other things, requiring courts to appoint "lead

plaintiffs" at the outset of all class action lawsuits subject to the PSLRA.

9.      Levi & Korsinsky, along with our client Douglas Drees, moved for appointment as lead plaintiff and lead counsel. Two other Resource Capital shareholders and their attorneys filed motions seeking the same relief. Under the terms of the PSLRA, Mr. Drees was presumed to be the most adequate plaintiff among the movants because he had the greatest financial interest in the Action due to his out-of-pocket losses of almost $350,000. On November 24, 2015 the Court appointed Douglas Drees as the lead plaintiff and Levi & Korsinsky as lead counsel.

10.     Over the course of the next three months, Levi & Korsinsky continued its investigation into Resource Capital, its disclosures about the Puerto Rico mezzanine loan, and its impairment. The investigation uncovered significant facts concerning the collateral that had been securing the mezzanine loan. On February 12, 2016, Plaintiff Douglas Drees filed an amended complaint alleging additional factual information in support of the claims against Defendants (the "Amended Complaint").

11.     The claims asserted in the Amended Complaint were still based on Defendants' failure to disclose the risks created by the mezzanine loan that was collateralized by real estate assets in Puerto Rico. This information was material to the market because investors would have considered it (*i.e.*, the risk of loss arising from Puerto Rican real estate) when deciding whether or not to purchase stock. The Amended Complaint alleged that the trading price of Resource Capital's securities was artificially inflated during the Class Period because of this material misrepresentation and/or omission and stockholders who bought during the Class Period were thereby damaged.

12.     Levi & Korsinsky obtained the information supporting these allegations from a thorough investigation. The investigation included reviewing almost three years of Resource Capital's filings with the SEC and public statements in press releases and conference calls. The investigation also included reviewing material about the company, such as analyst reports and information readily available on the internet. Finally, the investigation also included interviewing former employees of the company.

13.     Defendants moved to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim. These motions are standard in these types of cases because the PSLRA, in addition to providing rules concerning lead plaintiffs, requires plaintiffs to plead their claims with a very high level of specificity. Defendants' motion argued that Plaintiff had failed to meet this level of specificity and, therefore, had not sufficiently pleaded a claim of securities fraud under the Exchange Act.

14.     The parties spent approximately three months briefing the motion to dismiss. On October 5, 2016, the Court denied Defendants' motion. The Court held that Plaintiff had adequately pleaded that Defendants made misleading statements about the mezzanine loan to the public and, for that reason, were potentially in violation of the Exchange Act.

15.     Following the Court's decision, we were approached by counsel for Allen Altman, a purchaser of Resource Capital preferred shares. The Amended Complaint only asserted claims on behalf of purchasers of Resource Capital common stock. After discussions with Mr. Altman and his counsel and reviewing the relationship between the markets for Resource Capital preferred shares and common stock, we determined that there was no conflict of interest between the two sets of Resource Capital investors who had each suffered losses as a result of the same alleged misconduct by Defendants. We determined that it would be appropriate and efficient for a class of purchasers of Resource Capital preferred shares to be added to this Action. We also determined that Mr. Altman would be a suitable class representative for the class of preferred stock purchasers. Mr. Altman and the class of preferred stock purchasers were later added in a further amended complaint. We also agreed that, to the extent we were successful in obtaining a recovery for the purchasers of Resource Capital preferred stock, we would compensate Mr. Altman's counsel for the time and expenses it had incurred in representing him.

16.     Also following the Court's decision, but prior to beginning discovery, the parties agreed to participate in a private mediation session in an attempt to resolve the matter on an expedited basis and without incurring the costs and expenses typically associated with enduring litigation matters. The parties scheduled the mediation for April 10, 2017. In advance, Defendants

provided Plaintiff with a limited set of documents containing Resource Capital's "portfolio reports" showing how the company rated the mezzanine loan internally in terms of creditworthiness. We relied upon these documents (and others) in drafting a thorough mediation brief outlining the relative strengths and weaknesses of Plaintiff's claims. We also engaged a financial expert who performed an analysis to derive a preliminary estimate of class-wide damages, using methodologies that have been generally accepted by the federal courts. This analysis indicated potential class-wide damages of approximately $56 million. This included both Resource Capital common stock and preferred stock. Counsel for all parties, as well as representatives from Resource Capital's insurance carriers, attended the all-day mediation session on April 10, 2017 before mediator Robert A. Meyer, Esq. of JAMS. The mediation was, unfortunately, not successful.

17.     The parties proceeded to discovery in earnest following the failed attempt at mediation. Initial deadlines in the case included deadlines to exchange initial disclosures under Rule 26. Plaintiff's initial disclosures identified numerous areas of information that would be relevant in discovery, including the analysis and evaluation of loan positions, risk exposure in Puerto Rico, the mezzanine loan at issue, and corporate financing. Plaintiff also identified a number of third-parties likely to have information, including Moody's, Blackstone, and Fitch Ratings. Defendants identified Jonathan Cohen, David Bryant, Eldron Blackwell, David Bloom, and Brad Hoffman as individuals likely to have relevant information as well as identified categories of documents in their possession that Defendants may use to support their claims or defenses.

18.     The parties also served requests for production upon each other. Plaintiff's requests for production included: information relating to identifying the names, roles, and responsibilities of Resource Capital's employees and any third-parties retained by or on behalf of Resource Capital for services relating to the mezzanine loan; documents related to the acquisition of the mezzanine loan; documents related to the evaluation of the mezzanine loan at the time of purchase and through the relevant period; documents relating to Resource Capital's public disclosures; and documents

and communications relating to Resource Capital's share price, including communications with analysts or investors. Defendants requested a number of documents, including all documents described in Plaintiff's initial disclosures as well as all documents relating to the mezzanine loan, Plaintiff's investment in Resource Capital, the Puerto Rican economy, the efficiency or lack of efficiency of the market for Resource Capital's stock.

19.     Mr. Drees produced documentary discovery in response to Defendants' requests for production, including account statements and trade confirmations relating to his purchases and sales of Resource Capital stock. He had a number of accounts with many different transactions. The total amount of documents produced by Mr. Drees was substantial; indeed, he produced 3,819 pages of brokerage statements alone.

20.     Resource Capital produced 119,887 pages of documents. These documents included financial documents, board minute meetings, e-mails, contracts and agreements, affidavits and certificates, reports on various topics, including the Puerto Rican economy and troubled debt restructuring, insurance documents, and drafts of SEC filings.

21.     Plaintiff also engaged in substantial non-party discovery. In the course of just three months, Plaintiff served six non-party subpoenas for the production of documents. These subpoenas were served upon, among others, Moody's, Fitch Ratings, and Grant Thornton LLP. In total, the non-parties produced 51,139 pages of discovery. Critical to Plaintiff's claims was the creditworthiness of the mezzanine loan and whether and to what extent Resource Capital knew that the collateral underlying the mezzanine loan was declining in value.

22.     Discovery revealed that the collateral underlying the mezzanine loan (*i.e.*, the real estate in Puerto Rico) had been declining in value for several years prior to Resource Capital's August 4 disclosure. The mezzanine loan was subordinate to a secured financial investment (referred to as a "certificate") that was part of a larger real estate investment trust. Ratings companies like Moody's and Fitch Ratings had been downgrading the certificates for years prior to August 4, 2015; given that the collateral was the same for both the certificates and Resource Capital's mezzanine loan, it followed that the rating of the mezzanine loan tracked the ratings of

the certificate. Accordingly, the ratings for the certificates served as a proxy for the ratings of the mezzanine loan (which were not publicly rated by the rating agencies).

23.     Notwithstanding the public ratings of the certificates, Resource Capital's internal documents appeared to support the company's conclusion that an impairment of the mezzanine loan was not necessary until shortly before the August 4 announcement. Levi & Korsinsky retained an expert in the area of real estate financing and troubled debt restructurings in an effort to evaluate Resource Capital's reasoning and, importantly, help determine whether and when Resource Capital should have taken the impairment at issue in the lawsuit. Following an analysis of the discovery received, it appeared that there was no precise date at which the impairment should have been taken, thus leaving one of the most critical issues in the case open to the decision of a jury.

24.     At the same time we were engaging in merits discovery, the parties were also engaging in class certification discovery. Plaintiff intended to seek class certification on behalf of common stockholders as well as stockholders of certain preferred stock. The deadline for Plaintiff to seek class certification was June 2, 2017 and, prior to that date, Plaintiff filed the Second Amended Complaint identifying the preferred stockholders as a subclass being represented by Plaintiff Allen Altman. Mr. Altman served as our named plaintiff and prospective class representative. In addition to being deposed, Mr. Altman produced 3,264 pages of documents (primarily consisting of brokerage statements). On June 2, 2017, Plaintiffs moved for certification of classes consisting of Resource Capital's common and preferred stockholders.

25.     Plaintiffs engaged an expert economist for assistance with their class certification motion. A key issue in terms of obtaining class certification was whether Plaintiffs could avail themselves of the "fraud on the market" presumption (which alleviates Plaintiffs of having to prove reliance in support of their claims under the Exchange Act). To trigger the presumption, Plaintiffs had to show that the market for Resource Capital's securities was "efficient." Plaintiffs were able to do this by submitting an event study from their expert in support of the motion for class certification.

26.     In response to Plaintiffs' motion for class certification, Defendants deposed

Plaintiffs' expert in addition to both Plaintiffs (Drees and Altman). Defendants also relied on an expert of their own to counter Plaintiffs' arguments. Defendants argued in opposition that, while the market for Resource Capital's securities may have been efficient, Plaintiffs were not deserving of class certification because Plaintiffs were inadequate representatives and individual questions concerning class members' damages created insurmountable predominance problems under Rule 23. Specifically, Defendants argued that a uniform calculation of damages for all class members was not possible because Resource Capital's stock was inflated by varying amounts at different points in the Class Period.

27.     Plaintiffs replied to Defendants' opposition. In support of the reply, Plaintiffs submitted testimony from the deposition of Defendants' expert (whom I deposed) and supplemental testimony in the form of a declaration from Plaintiffs' expert. We argued that Defendants' concerns about predominance were overstated and that, under the law, our evidentiary showings were sufficient for the purposes of obtaining class certification. The Court agreed and granted class certification on November 22, 2017.

### B.     <u>SETTLEMENT</u>

28.     Certification of the Class changed the dynamics of the case. Shortly after the Court's order, the parties each spoke with Mr. Meyer, the mediator who had moderated the early mediation attempt following the motion to dismiss proceedings. Those conversations resulted in Mr. Meyer issuing a mediator's proposal whereby Defendants would pay $9.5 million to resolve all claims arising out of the litigation.

29.     Plaintiffs' accepted the mediator's proposal after due consideration. While Plaintiffs had been victorious in obtaining class certification, they still faced problems with respect to liability. The timing of the impairment was subject to debate and, in all likelihood, needed to be decided by a jury. Summary judgment was not likely to resolve the lawsuit in light of the factual issues at hand. Accordingly, trial would have been necessary. The expense and uncertainty involved with this outcome was enough to justify the settlement, especially given the fact that the

settlement represented an approximate 17% recovery of total damages ($9.5 million recovery relative to total overall estimated damages of $56 million). The median settlements in cases of this size typically range between 5% and 8%, according to the two leading economic consulting firms that monitor and analyze securities class action damages and settlements (discussed further below).

30.     Defendants also accepted the mediator's proposal. From there, the parties promptly began documenting the Settlement. This included drafting the stipulation of settlement, the class notice, the summary notice, the claim form, and the proposed orders granting preliminary and final approval. The parties signed the Stipulation on February 5, 2018.

### C.     PRELIMINARY APPROVAL OF THE SETTLEMENT

31.     Plaintiffs filed the motion for preliminary approval of the Settlement on February 5, 2018. The Court granted the motion on April 3, 2018 and, at that time, entered the Preliminary Approval Order holding, *inter alia*, that the settlement was appropriately within the range of reasonableness for preliminary approval, permitting the parties to proceed with notice to the class, and scheduling a hearing for final approval. The Court set the Final Approval Hearing for August 3, 2018, at 12:00 p.m.

### III.   SUMMARY OF THE SETTLEMENT AND NOTICE TO THE CLASS

### A.     SUMMARY OF THE SETTLEMENT AND THE PLAN OF ALLOCATION

32.     The Settlement Fund is an all-in settlement number, valued at $9,500,000, meaning that it includes all attorneys' fees, administration costs, expenses, class member benefits, as well as any other costs, expenses, or fees of any kind whatsoever associated with the resolution of the Action.

33.     The Class consists of "all persons or entities who purchased or otherwise acquired a legal or beneficial ownership interest in Resource Capital Common Shares, Series B Preferred Shares, or Series C Preferred Shares between October 31, 2012 and August 5, 2015."

34.     The Settlement Fund is to be distributed on a *pro rata* basis pursuant to the Plan of Allocation to those Class Members submitting valid claims (the "Authorized Claimants"). As set

forth in the Notice, the Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Settlement Fund (approved costs, fees and expenses) based upon each Authorized Claimant's Recognized Claim.

35.     The proposed Plan of Allocation is based upon the premise that Class Members sustained damages by purchasing their stock at artificially inflated prices. Accordingly, the proposed Plan of Allocation seeks to compensate Class Members in accordance with the amount by which the price of Resource Capital's stock declined upon dissemination of curative disclosures into the market.

36.     To explain, Plaintiffs alleged that Defendants concealed the risk of a mezzanine loan position involving real estate assets in Puerto Rico. When Defendants finally announced that Resource Capital was impairing the loan by $41.1 million, the trading price of Resource Capital's common stock plunged from its closing price of $3.48 on August 4, 2015, to close at $3.05 on August 5, 2015, a single-day loss of more than 12%, on extremely heavy trading. (The price of Resource Capital's Series B and C preferred stock declined as well, with the Series B shares falling from $19.90 per share to $18.25 per share and Series C shares falling from $20.56 per share to $18.77 per share during the same period.)

37.     Under the Plan of Allocation, Class Members who purchased shares during the Class Period and held at the close of trading on August 5, 2015 will claim a Recognized Loss of $0.43/share for common stock, a Recognized Loss of $1.65/share for Series B preferred stock, and a Recognized Loss of $1.79/share for Series C preferred stock (*i.e.*, the amounts by which each class of stock declined in response to Resource Capital's August 4 disclosure).

38.     This Plan of Allocation is fair and reasonable. It treats all Class Members the same in terms of losses. It also makes for manageable class administration, as each Class Member's Recognized Loss can be easily determined without regard to the amounts at which they purchased or sold their shares (as some Plans of Allocation do). Once each Class Member's Recognized Loss is calculated, *pro rata* distributions will be determined based upon the claims submitted by

dividing each Class Member's Recognized Loss by the total Recognized Loss of the claims submitted by the Class.

### B.  **NOTICE OF THE SETTLEMENT**

39.     Pursuant to the Court's Preliminary Approval Order, Levi & Korsinsky implemented a comprehensive notice program with the assistance of the Claims Administrator, Epiq. Epiq provided notice to the Class by mail and publication. Epiq also maintained (and continues to maintain) an internet website providing all pertinent information to the public (including the notice documents).

40.     The Notice, which the Court approved in conjunction with Plaintiffs' Motion for Preliminary Approval, contained, *inter alia*: (a) the amount and makeup of the Settlement Fund; (b) the Plan of Allocation; (c) that Levi & Korsinsky would apply for a fee award in an amount not to exceed 33% of the Settlement Fund, reimbursement of expenses incurred prosecuting this Action in an amount not to exceed $200,000, and incentive awards for Douglas Drees and Allen Altman in the amount of $10,000 and $5,000, respectively; (d) that any Class Member could object to the Settlement and/or fee and expense application or seek exclusion from the Class; (e) the date, time, and location of the Final Approval Hearing and that Class Members have the right to attend and be heard; and (f) that the deadline for filing Proofs of Claim is July 23, 2018.

41.     As of June 26, 2018, an aggregate of 52,185 copies of the Notice Packet have been disseminated to potential Class Members by the Claims Administrator.

42.     In addition, the Claims Administrator established and continues to maintain a toll-free telephone number to accommodate potential Class Members with questions about the Settlement. As of June 26, 2018, the Claims Administrator has received or placed a total of 386 calls (3,916 minutes) to the telephone hotline for assistance.

43.     Furthermore, since April 16, 2018, the Claims Administrator has established and maintained a website dedicated to the Settlement (www.ResourceCapitalSecuritiesLitigation.com) to provide additional information to Class Members. Website users can access and download

copies of the Notice, Summary Notice, Proof of Claim, Stipulation, and the Preliminary Approval Order.

44.     Pursuant to the Order of Preliminary Approval, Epiq caused the Summary Notice to be transmitted over *PR Newswire*, a national business-oriented newswire service, on April 17, 2018.

45.     All requests for exclusion from the Class and objections to the Settlement, the Plan of Allocation and the Fee Request are required to be filed no later than July 5, 2018 and July 13, 2018, respectively.

46.     As of June 29, 2018, there has been one objection concerning the Settlement. We have spoken with the objector who advises that its objection is primarily directed at the behavior of Defendants and not to the conduct of Plaintiffs' counsel during the course of the litigation. The objector has not opted out of the Settlement and has already submitted its claim form to receive its distribution as a class member. The objector does not object to the Plan of Allocation or request for attorneys' fees and expenses. There have not been any requests for exclusion from the Settlement.

## IV.     THE SETTLEMENT MEETS THE SECOND CIRCUIT'S STANDARD FOR FINAL APPROVAL

### A.     THE PARTIES WERE ABLE TO ASSESS THE STRENGTHS AND WEAKNESSES OF THEIR CASES

47.     Levi & Korsinsky, in furtherance of the Class's claims, undertook an extensive investigation, including interviews of former employees and review of a substantial record of public records regarding Resource Capital's business. My firm also conducted extensive party and non-party discovery. In total, we received and reviewed over 171,000 pages of documents pertaining to the mezzanine loan and its creditworthiness.

48.     These documents included workbooks from Resource Capital's auditor, statements from the credit rating agencies, and internal correspondence from Resource Capital all relating to

the mezzanine loan and how it should be treated in terms of its creditworthiness. With this information, we were able to consult with a highly regarded expert in the field of real estate financing and troubled debt restructurings and receive acute guidance pertaining to whether Resource Capital acted appropriately under the circumstances.

49.     As a result of this research and investigation, we had a comprehensive understanding of the strengths and weaknesses of the case and were able to make an informed decision concerning the fairness of the Settlement prior to its presentation to this Court.

## B.     THE SETTLEMENT APPROPRIATELY BALANCES THE RISK OF LITIGATION AND THE BENEFIT TO THE CLASS OF A CERTAIN RECOVERY

### 1.     Continued Litigation Posed Substantial Risks in Establishing Liability

50.     As discussed previously, our investigation and research ultimately revealed that Resource Capital's treatment of the mezzanine loan was debatable. Evidence showed that the mezzanine loan should have been impaired, but the exact date on which it should have been impaired was a factual issue requiring a jury to resolve. Although I believe that our presentation of the facts would have been persuasive (and ultimately successful at trial), Defendants could have offered potentially effective arguments of their own in their defense to Plaintiffs' claims. Of course, to this day, Defendants continue to deny all liability and wrongdoing and would have continued to do so through summary judgment proceedings at trial.

51.     A complex case such as this would have resulted in a prolific amount of documents being produced about Resource Capital's treatment of the mezzanine loan over an extended, multiple-year period. The parties would have ultimately had to take numerous party and non-party depositions which, although they would have been informative, likely would not have been able to definitively prove fraud as a matter of law. Accordingly, I considered the Settlement to be a favorable result in light of the risks of additional litigation (including potentially losing summary judgment, receiving an adverse ruling on a motion *in limine*, or losing at trial).

52.     The Settlement provides a significant and immediate recovery, without the further risk, expense and delay that continued litigation would bring.

### 2.     Continued Litigation Posed Substantial Risk in Proving Damages

53.     Even if we prevailed in establishing falsity and scienter, Plaintiffs would have had to prove loss causation (*i.e.,* that Defendants' misconduct caused the damages claimed). While I believe Plaintiffs could have overcome any arguments or defenses based on causation and damages, there was certainly no assurance that the jury would agree with Plaintiffs' arguments.

54.     Defendants had raised certain arguments in opposition to our class certification motion that could have proved persuasive later in the litigation; namely, that the price of Resource Capital's stock was allegedly inflated by different amounts at various points during the Class Period and that the decline in Resource Capital's stock following the August 4 disclosure was not necessarily indicative of the classwide damages, if any. While we would have been able to rebut this argument with expert testimony of our own, a jury might not have agreed with our view on the issue.

55.     Proof of damages would have been extremely complex and involve considerable risk for Plaintiffs. Proof of damages and causation in a "fraud-on-the-market" case like this entails a degree of complexity and sophistication that, in itself, is a risk to Plaintiffs' ability to carry their burden of proving damages at trial. As such, the damages valuations proffered by Plaintiffs and Defendants would have likely varied significantly.

56.     The continued risks of litigation, including proving damages, weighed in favor of accepting the Settlement.

### 3.     Collectability Risks to the Class

57.     Class action cases like this one can endure for years on end. If Plaintiffs were successful, Defendants could still appeal certain issues. While Resource Capital appeared sound from a financial point of view, real estate has been volatile at times and the company could have potentially fell upon hard times. The Settlement allows for payment now and, however unlikely a bankruptcy could have been, eliminates any risks of collectability.

4. **Balancing the Certainty of an Immediate Recovery Against the Expense and Likely Duration of Protracted Litigation Favors Settlement**

58.     Final approval of the Settlement will result in an immediate recovery for the eligible claimants. If the Action was to proceed rather than settle, formal discovery would have been costly and time-consuming. In addition, motions for summary judgment would likely have been filed. Even if Plaintiffs were successful in the litigation, appeals would have ensued and resulted in additional delay. It would likely be years before Class Members would have received any recovery. The Settlement is in the best interests of the Class.

C. **THE SETTLEMENT AMOUNT OF $9,500,000 IS AN EXTRAORDINARY RECOVERY AND WEIGHS HEAVILY IN FAVOR OF APPROVAL OF THE SETTLEMENT**

59.     Before representing to the Court that the Settlement is fair, reasonable, and adequate, I evaluated the prospects of obtaining a better result at trial—one that would also have to withstand later attack on appeal.

60.     With assistance from our expert economist, we estimated potential recoverable damages for the Class to be approximately $56 million ($50 million for common stock and $6.5 million for Series B and C preferred stock combined). The Settlement, therefore, represents almost 17% of the total damages that could have been recovered if Plaintiffs were completely successful on all issues of liability and damages in the Action.

61.     This percentage of recovery is extraordinary. Compared to other class action securities lawsuit settlements in cases with similar damages, the proposed Settlement is far and away better than most. NERA Economic Consulting and Cornerstone Research, the two leading economic firms that track and monitor class action settlements, issue annual reports. These reports provide statistics about class action settlements in securities fraud cases. For the period 1996 through 2017, the median settlement value as a percentage of investor losses in cases with damages

between $50 million and $99 million was 4.7%, according to NERA. For the period 2008 through 2016, Cornerstone calculated a median settlement percentage of 8.2% for cases with damages between $25 million and $74 million; when considering just 2017 alone, the percentage was only 6.0%.True and accurate copies of these reports are attached hereto as Exhibits 1 and 2, respectively. The relevant information in the NERA report is located in Figure 28 on page 37 and in the Cornerstone report in Figure 7 on page 8.

62.     While 17% of damages is less than a complete recovery, achieving success on all issues of damages and liabilities is extremely unlikely. Accordingly, the size of the recovery in light of the obstacles Plaintiffs would have faced through trial make the Settlement very favorable for the Class.

### D.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

63.     In order to develop a fair plan of allocation, we consulted with our expert economist and Epiq in terms of how to best compensate the Class Members who submitted approved claims. The Plan of Allocation described in the Notice is the product of those discussions. I believe it is best suited to compensate all Class Members equally while at the same time reducing claims administration costs. The Plan of Allocation is also relatively easy to understand (compared to plans of allocation that have been utilized in other class action cases).

64.     The Plan of Allocation provides Class Members with a fixed amount based upon the number of shares they held at the end of the Class Period. The Plan of Allocation, like Plaintiffs' estimate of Class-wide damages itself, assumes complete success on all aspects of liability and damages at trial and post-trial appeals. Thus, the Plan of Allocation credits all Class Members with the best possible result they could have achieved based on the number of Resource Capital shares they held when Resource Capital announced the impairment on August 4, 2015. This analysis was, at the time the Settlement was reached, the best estimate of damages that Plaintiffs had and is still the analysis that Plaintiffs would likely have presented to the trier of fact.

## V.   LEVI & KORSINSKY'S REQUEST FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARDS FOR PLAINTIFFS

### A.   THE FEE APPLICATION

65.     As compensation for our efforts, Levi & Korsinsky is applying for an award of attorneys' fees in the amount of 33% of the Settlement Fund ($3,166,667.67) and reimbursement of $199,463.67 in expenses reasonably incurred in the prosecution and settlement of the Action. The amount of the expenses is less than the amount of $200,000 published in the Notice sent to all Class Members. My firm has prosecuted this case for almost three years without any compensation and has incurred thousands of dollars in expenses without any guarantee of success.

66.     The fee request is within the range of fees awarded by courts in the Second Circuit, as further detailed and discussed the legal memorandum submitted in support of Plaintiffs' motion.

### B.   THE SETTLEMENT ACHIEVED

67.     Levi & Korsinsky has succeeded in obtaining a $9.5 million cash settlement, plus interest. The benefit to the Class represents almost 17% of the total estimated damages that could have been recovered if Plaintiffs were completely successful on all issues of liability and damages in the Action. (This percentage assumes that 100% of eligible Class Members will file timely claims; this percentage may increase depending on the number of Class Members that submit claims.) This achievement was the result of my firm's litigation and settlement negotiations. As a result of this Settlement, Class Members will receive immediate compensation for their losses in Resource Capital securities and will avoid the substantial risks of no recovery had the Action been litigated and lost at summary judgment, trial, or on appeal.

### C.   LEVI & KORSINSKY'S WORK AND EXPERTISE

68.     My firm engaged in extensive factual investigation and litigation of the claims alleged. To successfully prosecute the Action, we conducted an extensive investigation and

research into the merits of the Action and undertook significant efforts to bring the Action to its current procedural position, including:

- Performing an in-depth review and analysis of (a) Resource Capital's SEC filings; (b) research reports by securities and financial analysts; (c) transcripts of Resource Capital's earnings conference calls and industry conferences; (d) Resource Capital's press releases; (e) news and media reports concerning Resource Capital and other facts related to this action; and (f) data reflecting the pricing of Resource Capital's securities.

- Conducting a thorough investigation into the law and facts of the case;

- Conferring extensively with experts and consultants concerning the specialized issues in the case, including in drafting the complaints, and when analyzing class certification, loss causation, and damages;

- Briefing and defeating Defendants' motion to dismiss under Rule 12(b) and the stringent pleading standards of the PSLRA;

- Conducting months of discovery, including propounding and responding to multiple discovery requests, producing and reviewing documents, and issuing non-party subpoenas to entities around the country;

- Reviewing 119,887 pages of documents produced from Resource Capital alone and 51,139 pages of documents from half a dozen additional non-parties, including Moody's, Fitch Ratings, Blackstone, and Grant Thornton LLP;

- Drafting Plaintiffs' mediation statement, analyzing Defendants' mediation statement, and preparing for and participating in the mediation process, including a full-day mediation session held before a respected mediator;

- Preparing the Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel; and

- Taking and defending expert and party depositions in connection with Plaintiffs' successful bid for class certification.

69.     I also understand that counsel for Mr. Altman incurred 33.75 hours valued at $18,585.50 at current market billing rates in reviewing and investigating his claims and the claims of other purchasers of Resource Capital preferred stock. Provided that the Court awards us the fee requested, we have agreed to pay Mr. Altman's counsel $63,333, in compensation for this work which is approximately the same lodestar multiplier as we are seeking for our own work.

70.     The expertise and experience of Levi & Korsinsky is an important factor to be weighed in assessing a fair fee. As demonstrated in our firm biography, Lead Counsel has achieved significant securities class action settlements, as well as being counsel of record in cases establishing important precedents that enable litigation such as this to be successfully prosecuted. A true and accurate copy of Levi & Korsinsky's firm resume is attached hereto as Exhibit 3.

71.     My firm prosecuted the Action vigorously, expending substantial time and resources without any assurance of obtaining any compensation for their efforts. We have already devoted a significant amount of time to this case, and fully expect to devote more time in the future administration and distribution of the Settlement.

### D.     STANDING AND CALIBER OF OPPOSING COUNSEL

72.     The quality of the work performed by Defendants' Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.

73.     Defendants were represented by Covington & Burling LLP, one of the nation's leading defense firms with a renowned expertise in the field of securities class action litigation. Thus, the fact that Levi & Korsinsky achieved this Settlement for the Class in the face of such formidable legal opposition further evidences the quality of our work.

### E.     THE RISKS OF CONTINGENT LIABILITY

74.     My firm undertook representation of Plaintiffs and the Class on a wholly contingent basis.  We knew from the outset that we would expend a substantial amount of time prosecuting this action, yet receive no compensation if the Action proved ultimately unsuccessful. Thus, the contingent nature of payment of fees and expenses and the risks and complexity of the Action

should be given substantial weight by the Court in considering the instant application for fees and expenses.

75.     Private litigation of these cases provides an extremely important service to the public at large. The SEC is capable of only so much, thus a large need is serviced by my firm and firms like it. The requested fee provides incentive to our attorneys to continue the important work we do and help keep corporate wrongdoers accountable to their shareholders. These cases are extremely complex and expensive to litigate; rewarding the attorneys who take the risk to litigate them is paramount.

## F.     THE REACTION OF THE CLASS TO THE REQUESTED FEE

76.     As stated above, Epiq has mailed an aggregate of 52,185 copies of the Notice Packet to potential Class Members as of June 26, 2018. The Notice advised Class Members that my firm would apply for an award of attorneys' fees from the Settlement Fund, not to exceed 33% of the Fund.

77.     No potential Class Member has challenged the fees/expenses to be received by my firm and only one objection has been received to the Settlement as a whole. That objector has not opted out and intends to participate in the distribution of the Settlement Fund. The general lack of objection (or, for that matter, exclusion) from the Class proves that Settlement is entirely beneficial and the requested fee is well-deserved.

## G.     THE LODESTAR CROSSCHECK CONFIRMS THE REASONABLENESS OF THE REQUESTED FEE

78.     Courts may also consider a lodestar/multiplier approach in assessing the reasonableness of a fee request. The lodestar is determined by multiplying the number of reasonable hours worked on a client's case by a reasonable hourly billing rate for such services given the geographical location, the nature of the services provided, and the experience of the lawyer. It can then be increased or decreased based upon the contingent nature or risk in the

particular case involved, and the quality of the attorney's work. A percentage increase or decrease of the lodestar amount is referred to as a "multiplier".

79.     Altogether, Levi & Korsinsky dedicated over 2,000 hours to prosecuting this Action. These hours were compiled from contemporaneous time records maintained by each attorney and each paralegal affiliated with Levi & Korsinsky. Applying our normal hourly rates, which are consistent with those charged by similarly skilled firms in their respective geographic areas, to the hours expended in this Action yields a lodestar amount of $1,087,643.00.

80.     The following chart lists the professionals who worked on this matter, the role of each of the professionals, the number of hour expended by each such professional, and their hourly rates:

| Name and Title* | Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Eduard Korsinsky (P) | 30.00 | $885-$995 | $26,907.50 |
| Joseph Levi (P) | 29.00 | $885-$995 | $25,967.50 |
| Nicholas I. Porritt (P) | 208.50 | $875-$925 | $190,737.50 |
| Adam M. Apton (P) | 637.75 | $525-$765 | $404,133.75 |
| Alexander Krot (A) | 11.50 | $435-$575 | $5,640.00 |
| Adam McCall (A) | 71.25 | $455 | $32,418.75 |
| Cecille Cargill (A) | 15.50 | $495 | $7,672.50 |
| Christopher Kupka (A) | 5.25 | $575 | $3,018.75 |
| Justin Sherman (A) | 1.50 | $575 | $862.50 |
| Julia Sun (A) | 7.25 | $695 | $5,038.75 |
| Lori Fulmer (A) | 439.00 | $350 | $153,650.00 |
| Michael Ershowsky (A) | 299.85 | $400-$455 | $135,683.75 |
| Michelle Gruesbeck (A) | 163.00 | $455 | $74,165.00 |
| Paralegal/Paraprofessional | 81.95 | $265-$280 | $21,746.75 |
| **Total** | **2001.30** | | **$1,087,643.00** |

(* - "P" and "A" denotes Partner and Associate, respectively. Adam M. Apton was promoted to partner earlier this year. He was an associate during the majority of this litigation.)

81.     The total number of hours expended by attorneys at my firm is 2,001.30 hours. This number is derived from the contemporaneous, daily time records regularly prepared and maintained by Lead Counsel. The total amount for the services based upon our billing rates is $1,087,643.00.

82.     In addition to the time invested in the Action by my firm, Levi & Korsinsky also expended a total of $199,463.67 in unreimbursed expenses in connection with the prosecution of this litigation. The following table, compiled from the records regularly maintained by Levi & Korsinsky, lists the expenses incurred in furtherance of this Action:

| Expense | Amount |
|---------|--------|
| Expert Services | $162,223.81 |
| Investigation Services | $5,400.00 |
| Photocopying/Printing Vendors | $3,891.29 |
| Notices/Publication | $1,393.54 |
| Postage/Delivery/Courier | $918.77 |
| Mediation | $4,823.77 |
| Travel | $13,709.25 |
| Filing Fees/Court Costs/Court Reporter | $7,103.24 |
| **Total** | **$199,463.67** |

83.     The expenses incurred pertaining to this Action are reflected in the books and records of my firm. These books and records are prepared from expense vouchers and check records, and are an accurate record of the expenses incurred by my firm.

84.     The expert fees, which comprise the majority of the expenses generated in this litigation, were paid to two different experts. One expert provided services with respect to evaluating the mezzanine loan at issue in this lawsuit and its creditworthiness. The other expert

provided assistance calculating classwide damages and establishing evidence in support of our argument that the market for Resource Capital's securities was efficient (for the purposes of triggering the "fraud on the market" presumption).

85.     The expenses my firm incurred in the course of litigating this matter were all reasonably necessary for and directly related to the prosecution of this case.

## VI.     PLAINTIFFS DOUGLAS DREES AND ALLEN ALTMAN ARE DESERVING OF INCENTIVE AWARDS

86.     Plaintiffs also seek modest incentive awards in exchange for their commitment in the Action. Douglas Drees was the court-appointed lead plaintiff and, as such, has been involved in the litigation of this matter for well over two years. He is an attorney by profession and very knowledgeable in terms of Resource Capital's operations and real estate investments in general. He provided valuable assistance to the prosecution of this Action and should be compensated accordingly.

87.     Allen Altman served as an additional class representative for the purposes of representing Series B and Series C preferred stockholders. Without his involvement, Plaintiffs would not have been able to secure a recovery on behalf of these security holders.

88.     Both Douglas Drees and Allen Altman provided document discovery and testimony at depositions. Their persistence in regards to this Action and its Settlement is noteworthy and, thus, I recommend that they each receive the incentive payments requested.

## VII.     CONCLUSION

89.     I respectfully submit that, based on an understanding of the facts and circumstances concerning the subject matter of this Action, the principles of law applicable to them, the procedural posture of this Action, and the risks of continued litigation against Defendants, the Settlement is fair, reasonable and adequate, and represents a beneficial result for the Class and should be approved by this Court.

[Signature on following page]

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of June, 2018.

Nicholas I. Porritt