UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAREN LEVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RESOURCE CAPITAL CORP., JONATHAN Z. COHEN, DAVID J. BRYANT, ELDRON C. BLACKWELL, and DAVID E. BLOOM,<br><br>Defendants. | Case No. 1:15-cv-07081-LLS<br><br>CLASS ACTION<br><br>**DECLARATION OF ALEXANDER VILLANOVA IN SUPPORT OF MOTION FOR DISTRIBUTION OF NET SETTLEMENT FUND** |

I, Alexander Villanova, declare and state as follows:

1. I am a Senior Project Manager for Epiq Class Action & Claims Solutions, Inc. ("Epiq"). The following statements are based on my personal knowledge and information provided by other Epiq employees working under my supervision.

2. Epiq was retained by Lead Counsel to serve as the Claims Administrator in connection with the settlement of the above-captioned action (the "Action"), and appointed pursuant to paragraph 5 of the Court's Order Granting Preliminary Approval of Settlement dated April 3, 2018 ("Preliminary Approval Order). Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Stipulation of Settlement filed on February 5, 2018 (the "Settlement"). As Claims Administrator, Epiq has, among other things: (i) mailed the Notice of Pendency and Proposed Settlement of Class Action (the "Notice") and the Proof of Claim and Release Form (the "Proof of Claim" and, together with the Notice, the "Notice Packet") to potential Class Members, brokers, and other nominees; (ii) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (iii) created and continues to

maintain a settlement website and posted case-specific documents on it, at https://www.ResourceCapitalSecuritiesLitigation.com; (iv) caused the Summary Notice to be published*;* (v) provided, upon request, additional copies of the Notice Packet to potential Class Members, brokers, and other nominees; and (vi) received and processed Proofs of Claim.

3. On August 3, 2018, the Court entered the Final Judgment and Order of Dismissal with Prejudice (the "Judgment"). Pursuant to the Judgment, the Court approved the Settlement and adopted its terms. In addition, the Court approved the proposed plan for allocating the net settlement proceeds among eligible Class Members as set forth in the Notice (the "Plan of Allocation"). Epiq has completed processing all Proofs of Claim received through January 2, 2019, in accordance with the Settlement and the Plan of Allocation, and now submits its administrative determinations accepting and rejecting the Proofs of Claim in preparation for a distribution of the Net Settlement Fund to Authorized Claimants. Epiq also presents this declaration in support of Lead Plaintiffs' Motion for Entry of a Class Distribution Order.

## DISSEMINATION OF THE NOTICE

4. As more fully described in the Supplemental Declaration of Alexander Villanova, dated July 24, 2018, Epiq had mailed 52,243 Notice Packets to potential Class Members, brokers, and other nominees as of July 19, 2018. Since that date, 283 additional Notice Packets have been mailed. In total, Epiq has mailed 52,526 Notice Packets to potential Class Members, brokers and other nominees.

5. Pursuant to the terms of the Preliminary Approval Order, Epiq caused the Summary Notice to be transmitted once over *PR Newswire* on April 17, 2018.

## PROCEDURES FOLLOWED IN PROCESSING PROOFS OF CLAIM

6. Under the terms of the Preliminary Approval Order and as set forth in the Notice, each Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Proof of Claim postmarked no later than July 23, 2018, together with adequate supporting documentation for the transactions and holdings reported therein. Through January 2, 2019, Epiq has received 8,064 Proofs of Claim.

7. In preparation for receiving and processing Proofs of Claim, Epiq: (i) conferred with Lead Counsel to define the project guidelines for processing Proofs of Claim; (ii) created a unique database to store Proof of Claim details and images of Proofs of Claim and supporting documentation; (iii) trained staff in the specifics of the project so that Proofs of Claim would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Class Members' identifying information and transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Losses pursuant to the Court-approved Plan of Allocation set forth in the Notice.

8. Class Members seeking to share in the Net Settlement Fund were directed in the Notice to submit their Proofs of Claim to a specific post office box address. Notice Packets that were returned by the U.S. Postal Service as undeliverable were reviewed for updated addresses and, where available, new addresses were entered into the database and Notice Packets were mailed to the updated addresses. A total of 543 Notice Packets were returned by the U.S. Postal Service as undeliverable. Any correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

## PROCESSING PAPER PROOFS OF CLAIM

9. Of the 8,064 Proofs of Claim received by Epiq through January 2, 2019, 4,261 were paper Proofs of Claim. Once received, these Proofs of Claim were opened and prepared for scanning. This process included unfolding documents, removing staples, copying documents with nonconforming sizes, and sorting documents. This manual task of preparing the paper Proofs of Claim is very laborious and time-intensive. Once prepared, the paper Proofs of Claim were scanned into a database together with all submitted documentation. Each Proof of Claim was assigned a unique Proof of Claim number. Once scanned, the information from each Proof of Claim, including the claimant's name, address, account number/information from the supporting documentation, and purchase/acquisition transactions, sale transactions, and holdings listed on the Proof of Claim, were entered into a database developed by Epiq to process Proofs of Claim. Next, the documentation provided by each claimant in support of his, her, or its Proof of Claim was reviewed to determine: (i) whether the claimant traded or otherwise acquired Resource Capital Corporation ("Resource Capital" or the "Company") common stock, Series B preferred stock, and/or Series C preferred stock (herein referred to as "Resource Capital Securities") during the Class Period; (ii) whether the transaction information entered on the Proof of Claim was supported by the documentation; (iii) that the claimant did not have any additional trades not reflected on his, her, or its Proof of Claim; (iv) that the name of the claimant matched the information on the trade documentation, or additional documentation was provided to support any name changes; and (v) that the beneficial owner on the trade documentation, or a valid representative, was the person who signed the Proof of Claim.

10. In order to process the transactions detailed on the Proofs of Claim, Epiq utilized internal codes to identify and classify any deficiency or ineligibility conditions that existed within those Proofs of Claim. The appropriate codes were assigned to the Proofs of Claim as they were

processed.  For example, where a Proof of Claim was submitted by a claimant who did not have any eligible transactions in Resource Capital Securities during the Class Period (*e.g.*, the claimant purchased Resource Capital Securities only before or after the Class Period), that Proof of Claim would receive a defective code that denoted ineligibility.  Similar defective codes were used to denote other ineligible conditions, such as duplicate Proofs of Claim.  These message codes would indicate to Epiq that the claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Proof of Claim unless the deficiency was cured in its entirety.  Examples of conditions of ineligibility are as follows:

| | |
|---|---|
| ND | No Documentation Submitted for the Entire Proof of Claim |
| MD | Inadequate Documentation Submitted for the Proof of Claim |
| DP | Duplicate Claim Submitted |
| PO | No Eligible Purchase During the Class Period |
| SG | No Signature |
| ZR | No Recognized Loss |

11. Because a Proof of Claim may be deficient only in part, but otherwise acceptable, Epiq utilized codes that are only applied to specific transactions within a Proof of Claim.  For example, if a claimant submitted a Proof of Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a transaction-specific defective code.  That code indicated that one transaction was deficient, but that the Proof of Claim was otherwise eligible for payment if other transactions in the Proof of Claim calculated to a Recognized Loss according to the Plan of Allocation.  Thus, even if the deficiency was never cured, the Proof of Claim could still be partially accepted.  A few examples of transaction-specific message codes are as follows:

| | |
|---|---|
| BL | Claim did not Balance/Trade Discrepancy |
| PR | Partial Documentation |

5
DECL. OF ALEXANDER VILLANOVA
Case No. 1:15-cv-07081-LLS

| | |
|---|---|
| RC | Received Shares (*i.e.*, shares transferred into an account) |
| EN | No Proof of End Holdings |

## PROCESSING ELECTRONICALLY FILED PROOFS OF CLAIM

12.     Of the 8,064 Proofs of Claim received by Epiq through January 2, 2019, 3,803 were filed electronically.  Electronic Claims are typically submitted by institutional investors who may have hundreds, thousands, or even millions of transactions during the Class Period.  Rather than provide reams of paper requiring data entry, the institutional investors filing electronic Claims either mail a computer disc or electronically submit a file to Epiq so that Epiq may electronically upload all transactions to its proprietary database developed for the Settlement.

13.     Epiq maintains a Securities Team to coordinate and supervise the receipt and handling of all electronic Claims.  In this case, the Securities Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format, and to identify any potential data issues or inconsistencies within the file.  If any issues or inconsistencies arose, Epiq notified the sender.  If the electronic file was deemed to be in an acceptable format, it was then loaded to Epiq's database.

14.     Once the file was loaded, the electronic Claims were coded to identify them as electronic Claims and message codes were applied to denote any deficiencies or ineligible conditions that existed within them.  These message codes are similar to those applied to paper Proofs of Claim.  In lieu of manually applying message codes, the Securities Team performed programmatic reviews on electronic Claims to identify deficient and ineligible conditions – such as, but not limited to, price per share/net amount validation issues, out of balance conditions, and transactions outside the Class Period, etc.  The output was thoroughly verified and confirmed as accurate.

15. The review process also included flagging any electronic Claims that were not accompanied by a signed Proof of Claim, which serves as a "Master Proof of Claim Form" for all accounts referenced on the electronic file submitted. This process was reviewed by Epiq's Securities Team and, where appropriate, Epiq contacted the institutional filers whose electronic files were missing information. This process ensured that all claims were submitted by properly authorized representatives of the claimants.

16. Finally, at the end of the process, Epiq performed various targeted reviews of electronic Claims. Specifically, Epiq used the calculated Recognized Loss and other identified criteria to flag and reach out to a number of electronic filers and request that various sample purchases, sales, and holdings selected by Epiq be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews helped to ensure that electronic data supplied by claimants did not contain inaccurate information. Epiq also performed additional targeted reviews in connection with the largest Claims.

## EXCLUDED PERSONS

17. Epiq reviewed all Proofs of Claim to ensure that they were not submitted by, or on behalf of, excluded persons to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants, and other excluded persons and entities set forth in the Settlement and the Notice, and through the claimants' certifications on the Proofs of Claim. Epiq also reviewed all Proofs of Claim against the list of persons who were excluded from the Class pursuant to requests for exclusion as listed in Exhibit A of the Judgment.

## ADDITIONAL COMPLEXITIES ENCOUNTERED
## IN CLAIMS PROCESSING

18.     Many of the Proofs of Claim Epiq received were deficient or ineligible for one or more reasons and therefore were subjected to the additional processing, correspondence, and telephonic communications described in the sections below entitled "The Deficiency Process" and "Electronic Claim Reporting."

19.     During the processing of Proofs of Claim, Epiq encountered "non-conforming" Proofs of Claim, which, in general, require significantly more work than ordinary Proofs of Claim because of the information contained in or missing from the Proof of Claim or the manner in which the Proof of Claim was completed.  Non-conforming Claims include, among other conditions: missing pages; no name or address; Proofs of Claim that are blank but submitted with documentation for Epiq to complete; and Proofs of Claim that are so materially deficient as to make what is being claimed unrecognizable.

## THE DEFICIENCY PROCESS

20.     Approximately 2,189 of the 4,261 paper Proofs of Claim, or approximately 51.3% of the paper Proofs of Claim submitted, were incomplete or had one or more defects or conditions of ineligibility, such as the Proof of Claim not being signed, not being properly documented, or indicating no eligible transactions in Resource Capital Securities during the Class Period.  A majority of Epiq's efforts in handling an administration involve claimant communications, so that all claimants have a sufficient opportunity to cure any deficiencies and file a complete Proof of Claim.  The "Deficiency Process," which primarily involved mailing letters to claimants and, in response, making and receiving calls and sending and receiving emails to and from claimants, was intended to assist claimants in properly completing their otherwise deficient submissions so that they would be eligible to receive a distribution from the Net Settlement Fund.

21. If a Proof of Claim was determined to be defective or ineligible, a Notice of Incomplete Proof of Claim Submission ("Deficiency Notice") was sent to the claimant describing the defect(s) or condition(s) of ineligibility in their Proof of Claim and what was necessary to cure any "curable" defect(s) in the Proof of Claim. The Deficiency Notice advised the claimant that the submission of the appropriate information and/or documentary evidence to complete the Proof of Claim had to be sent within twenty (20) days from the date of the letter, or the Proof of Claim would be recommended for rejection to the extent the deficiency or condition of ineligibility was not cured. The Deficiency Notice also advised claimants that if they desired to contest the administrative determination, they were required to submit a written statement to Epiq requesting Court review of the determination and setting forth the basis for the request. Epiq sent a total of 3,053 Deficiency Notices to claimants.[1] Attached hereto as Exhibit A is an example of the Deficiency Notice.

22. Claimants' responses to the Deficiency Notices were scanned into Epiq's database and associated with the corresponding Proofs of Claim. The responses were then carefully reviewed and evaluated by Epiq's team of processors. If a claimant's response corrected the defect(s), Epiq updated the database manually to reflect the change in status of the Proof of Claim.

### ELECTRONIC CLAIM REPORTING

23. Using the following process, Epiq provided electronic claim submitters whose submissions were deficient with an email attaching a Transaction Report which listed the specific electronic Claims that were incomplete along with a list of the specific portions of the Claims that were incorrect or incomplete. The Transaction Reports:

---

[1] The number of Deficiency Notices sent exceeds the number of deficient Claims because in certain instances the response to the initial notice created a further deficiency and so a second notice was sent.

    (a)    were sent electronically to 99 filers who submitted 2,537 deficient or ineligible electronic Claims;

    (b)    identified individual transactions and entire electronic Claims that were found to be deficient or ineligible so that the filer on behalf of the claimant had the opportunity to correct the deficient condition or contest the determination of ineligibility;

    (c)    stated that any deficient transactions or electronic Claims that remain uncured, as well as any transactions or electronic Claims that were identified as ineligible on the Transaction Report, would be recommended for rejection;

    (d)    notified the filer that it could, on behalf of the claimant, request that the Court review Epiq's administrative determination if it wished to contest the rejection of any transactions or electronic Claims; and

    (e)    provided Epiq's contact information so that the filer could reach out to Epiq if it had any questions or required assistance.

    24.    The responses to the Transaction Reports were reviewed by Epiq's Securities Team, scanned, and/or loaded into Epiq's database, and associated with the corresponding electronic Claim. If the response corrected the defect(s) or affected the electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect the change in status of the electronic Claim.

## DISPUTED CLAIMS

    25.    As noted above, claimants were advised that they had the right to contest Epiq's administrative determination of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, such persons were advised in the Deficiency Notice and in the Transaction

Reports that to dispute Epiq's determinations, they needed to provide a statement of reasons indicating their grounds for contesting the rejection, along with supporting documentation.

26.  Epiq received 43 requests for a review by the Court of the administrative determinations made by Epiq.  In an attempt to resolve the disputes without the Court's intervention, Epiq attempted to contact all of the persons requesting Court review, answer all of their questions, and fully explain Epiq's determination of the Claim's status, and attempted to facilitate the submission of missing information or documentation where applicable.  As a result of these efforts, 38 Claims for which Court review had been requested have either been cured or the request for Court review has been retracted.  This leaves a remainder of 7 Claims from 5 Claimants whose request for Court Review have not been resolved or retracted.  All 5 Claimants were contacted via telephone and advised of their rights and the reason why their claim was denied pursuant to the Plan of Allocation and all of these Claimants still wish to maintain their requests for Court Review. Details regarding why these claims are recommended to the Court for rejection can be found in the table below.

| **Claim Number** | **Disputed Claim Category** |
|---|---|
| 161 | No Recognized Loss under the Plan of Allocation as shares were not held over a corrective disclosure. |
| 399 | No Recognized Loss under the Plan of Allocation as shares were not held over a corrective disclosure. |
| 400 | No Recognized Loss under the Plan of Allocation as shares were not held over a corrective disclosure. |
| 410 | No Recognized Loss under the Plan of Allocation as shares were not held over a corrective disclosure. |
| 4193 | No Recognized Loss under the Plan of Allocation as shares were not held over a corrective disclosure. |

| | |
|---|---|
| 4194 | No Recognized Loss under the Plan of Allocation as shares were not held over a corrective disclosure. |
| 4232 | No purchases of Resource Capital Securities in the Class Period. |
| **TOTAL** | **7** |

### LATE BUT OTHERWISE ELIGIBLE PROOFS OF CLAIM

27.  Through January 2, 2019, Epiq received 370 Proofs of Claim that were postmarked after the July 23, 2018, Proof of Claim submission deadline established by the Court. Epiq processed all late Proofs of Claim received through January 2, 2019, and 160 have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). Epiq has not rejected any Proof of Claim received through January 2, 2019, solely based on its late submission, and Epiq believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, Epiq recommends that they be eligible for payment.

28.  However, there must be a final cut-off date after which no more Proofs of Claim will be accepted so that there may be a proportional distribution of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Proofs of Claim or responses to Deficiency Notices received during the finalization of the administration and the preparation of this application would necessarily require a delay in the distribution. Accordingly, it is also respectfully requested that this Court order that no Proof of Claim received after January 2, 2019, be eligible for payment for any reason whatsoever. Completing the processing of these Claims at this time would delay the submission of this application.

### QUALITY ASSURANCE

29. An integral part of all of Epiq's settlement administration projects is its quality assurance review. Epiq's personnel worked throughout the entire administration process to ensure that Proofs of Claim were processed properly; that deficiency and ineligibility message codes were properly applied to Proofs of Claim; that Deficiency Notices were mailed to the appropriate claimants; and that Epiq's computer programs were operating properly.

30. In support of the work described above, Epiq staff designed, implemented, and tested the following programs for this administration: (i) data entry screens that store Proof of Claim information (including all transactional data included on each Proof of Claim and in any supporting documentation), attach message codes and, where necessary, apply text to denote conditions existing within the Proof of Claim; (ii) screens for the analyst to review images of the Proof of Claim and any supporting documentation provided; (iii) programs to load and analyze transactional data submitted electronically for all electronic Claims (the load program converts the data submitted into the format required by the calculation program, and the analysis program determines if the data is consistent and complete); (iv) a program to compare the claimed transaction prices against the reported market prices to confirm that the claimed transactions were within an acceptable range of the reported market prices; (v) a calculation program to analyze the transactional data for all Proofs of Claim and calculate the Recognized Losses; and (vi) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible Proofs of Claim.

31. Epiq's Securities Team performed a final quality control check once all of the accepted Claims were processed, Deficiency Notices were mailed, and deficiency responses were reviewed and processed, to ensure the correctness and completeness of all of the Proofs of Claim processed, before Epiq prepared its final reports to Lead Counsel. Here, in connection with this

quality assurance wrap-up, Epiq: (i) confirmed that Proofs of Claim that are recommended for approval have no messages denoting ineligibility; (ii) confirmed that Proofs of Claim that are recommended for rejection have messages denoting ineligibility; (iii) confirmed that all Proofs of Claim requiring "deficiency" notices were sent such notices; (iv) performed a sample review of deficient Proofs of Claim; (v) reviewed a sampling of Proofs of Claim with high Recognized Loss amounts; (vi) sampled Proofs of Claim that had been determined to be ineligible, including those with no Recognized Loss calculated in accordance with the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (vii) retested the accuracy of the calculation program.

32.     As part of its due diligence in processing the Claims, Epiq conducted a questionable claim filer search of all Proofs of Claim and electronic Claims filed in the Settlement. Epiq maintains a database of known questionable filers. This database contains names, addresses, and aliases of individuals who have been investigated by government agencies for questionable claim filing as well as names and contact information, compiled from previous settlements that Epiq has administered, of individuals from whom fraudulent claims were received. Epiq updates this database on a regular basis. The database for the Settlement was searched for all individuals identified in our questionable claim filer database. Epiq performed searches based on name, aliases, address, and city/zip code. In addition, all of Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including for claims submitted by claimants not previously captured in our database as questionable claim filers. Processors are instructed to flag claims as questionable claims and route them to the project manager and Securities Team for review. No questionable Proofs of Claim were identified through this review.

**DISPOSITION OF PROOFS OF CLAIM**

33.     Epiq has completed the processing of the 8,064 Proofs of Claim that were received through January 2, 2019, and has determined that 3,888 are acceptable in whole, 160 are acceptable in part, and 4,016 should be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss when calculated in accordance with the Plan of Allocation.

34.     Of the Proofs of Claim that are acceptable in part, there are 332 Proofs of Claim which include sufficient documentation of the purchases during the Class Period, but that are missing documentation for one or more sale transaction(s) or for unsold holdings which would be matched to the purchases.  Epiq recommends allowing these partial documentation Claims to be paid as if they were fully documented.  We make this recommendation because: (i) for each Claim, the Authorized Claimant has provided adequate documentation to support his or her purchase(s) during the Class Period and, thus, his or her status as a Class Member; (ii) the Authorized Claimant has provided the requested information as to the sale transaction(s) or unsold holdings and a Proof of Claim form signed under penalty of perjury declaring the accuracy of this information; (iii) this will reduce costs to the Net Settlement Fund for resolving questions and disputes; and (iv) the total number of such Proofs of Claim is low enough that the impact on other Authorized Claimants will be negligible; based on the total Recognized Loss amount of all valid Proofs of Claim, and the total Recognized Loss amounts of these partially documented sales and holdings, this proposal would affect other valid Proofs of Claim by less than 2%.

35.     The 4,016 wholly rejected Proofs of Claim are recommended for rejection by the Court for the following reasons:

**Summary of Rejected Proofs of Claims**

| **Reason for Rejection** | **Number of Proofs of Claim** |
|---|---|
| No Eligible Purchases/Acquisitions During the Class Period | 650 |

| | |
|---|---:|
| Proof of Claim Did Not Result in a Recognized Loss | 2,761 |
| Deficient Proof of Claim with Condition of Ineligibility Never Cured | 398 |
| Duplicate Proof of Claim | 62 |
| Proof of Claim Withdrawn/Voided | <u>145</u> |
| **TOTAL** | 4,016 |

36. A list of the Proofs of Claim submitted and Epiq's recommendation as to their disposition is contained in the Administrator's Report attached hereto as Exhibit B. Exhibit B-1, entitled "Timely Eligible Claims," lists all timely filed, provisionally accepted Proofs of Claim, and states their Recognized Loss. Exhibit B-2, entitled "Late But Otherwise Eligible Claims," lists all late-filed, provisionally accepted Proofs of Claim and states their Recognized Loss. Exhibit B-3, entitled "Rejected Claims," lists all wholly rejected Proofs of Claim and states the reason for their rejection. For privacy reasons, Exhibit B provides only the claimant's claim number and Recognized Loss or reason for rejection (no names, addresses, taxpayer ID, social security or social insurance numbers are disclosed).

37. Epiq has determined that 4,048 Proofs of Claim should be accepted. The Proofs of Claim recommended for acceptance represent total Recognized Losses of $ 22,705,910.70. Of that total, $ 20,371,225.70 is for Timely Eligible Claims and $ 2,334,685.00 is for Late But Otherwise Eligible Claims. According to the Plan of Allocation, each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her, or its Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants. Upon approval by the Court, Epiq will prepare and mail checks (or wire transfers where applicable) to Authorized Claimants for their payment amount subject to the provisions of the Court-approved distribution plan.

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

38.     Should the Court concur with Epiq's determinations concerning the provisionally accepted and rejected Claims, including the Late But Otherwise Eligible Claims, Epiq recommends the following distribution plan (the "Distribution Plan"):

(a)     Epiq will distribute 100% of the available balance of the Net Settlement Fund – after deducting any Notice and Administration Costs, Taxes, and Tax Expenses – to Authorized Claimants who would receive at least $10.00 based on their Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants.

(b)     In order to encourage Authorized Claimants to promptly deposit their payments, all distribution checks will bear a notation "DEPOSIT PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 90 DAYS OF DISTRIBUTION."[2]

(c)     Authorized Claimants who do not negotiate their distribution checks within the time allotted or on the conditions set forth in footnote 2 will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available to be distributed to other Authorized Claimants if Lead Counsel, in consultation with Epiq, determines that it is

---

[2] For Authorized Claimants whose checks are returned as undeliverable, Epiq will endeavor to locate new addresses through reasonable means. Where a new address is located, Epiq will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address. In the event an Authorized Claimant loses or damages his, her or its check, or otherwise requires a new check, Epiq will issue replacements. Distribution re-issues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, Epiq will void the initial payment prior to re-issuing a payment. In order not to delay further distributions to Authorized Claimants who have timely negotiated their checks, Epiq's outreach program described in the preceding sentences shall end 30 days after the initial void date. Authorized Claimants will be informed that, if they do not cash their distribution checks within the 90 days from the mail date, or they do not cash check reissues within 60 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited and the funds will be re-allocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received prior to the next planned distribution. Requests for reissued checks in connection with any second distribution and any subsequent distributions will be handled in the same manner.

cost-effective to conduct a second distribution. Similarly, Authorized Claimants who do not negotiate their second or subsequent distributions (should such distributions occur) within the time allotted or on the conditions set forth in footnote 2 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d) Consistent with the Plan of Allocation, after Epiq has made reasonable and diligent efforts to have Authorized Claimants negotiate their distribution checks, which efforts shall consist of the follow-up efforts described in footnote 2, but no earlier than six (6) months after the initial distribution, Lead Counsel, in consultation with Epiq, will determine whether it is cost-effective to conduct a second distribution of the Net Settlement Fund. Additional re-distributions may occur thereafter in six (6) month intervals until Lead Counsel, in consultation with Epiq, determines that further re-distribution is not cost-effective.

(e) If further re-distribution of the funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance of the Net Settlement Fund shall be contributed in accordance with paragraph 36 of the Stipulation for Settlement to a designated nonsectarian charitable organization as approved by the Court.

(f) No new Proofs of Claim may be accepted after January 2, 2019, and no further adjustments to Proofs of Claim received on or before January 2, 2019, that would result in an increased Recognized Loss amount may be made for any reason after January 2, 2019.

(g) Unless otherwise ordered by the Court, one year after the final distribution, Epiq will destroy the paper copies of the Proofs of Claim and all supporting documentation, and one year after all funds have been distributed, Epiq will destroy electronic copies of the same.

## **CONCLUSION**

39. Epiq respectfully requests that the Court enter the proposed Class Distribution Order.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 25, 2019, in Beaverton, Oregon.

_____
Alexander Villanova